## Crouch v. Commonwealth.

(Decided November 29, 1916.)

### Appeal from Bath Circuit Court.

1. Homicide—Appointment of Deputy Marshals.—In towns of the sixth class, the board of trustees is the only authority authorized to appoint deputy marshals and other necessary police officers.

2.  Municipal Corporations—Power Conferred Upon by Legislature—
    Exercise of.—Where the legislature grants a power to a municipal
    corporation, and does not expressly name the person or authority,
    which is authorized to exercise the power, the common council
    of the municipality, as the general agent of the municipality, is
    authorized to exercise it.

3.  Criminal Law—New Trial—Newly Discovered Evidence.—A new
    trial will not be granted because of newly discovered evidence,
    unless the applicant files his own affidavit, showing that he did
    not know and could not have known by the exercise of reasonable
    diligence, of the newly discovered evidence, prior to the trial, and
    also, the affidavit of the new witness, in which shall be set out
    the facts, which he will prove.

4.  Criminal Law—New Trial—Newly Discovered Evidence.—A new
    trial will not be granted because of newly discovered evidence,
    which is merely cumulative; nor because of newly discovered evi-
    dence, which can only be used to impeach a witness, who has tes-
    tified upon the trial, except in a few extreme cases.

5.  Criminal Law—New Trial—Newly Discovered Evidence.—A new
    trial will not be granted because of newly discovered evidence,
    unless the character of the evidence is such, that it will be reason-
    ably calculated to have a decisive influence upon the result of the
    trial.

C. W. GOODPASTER, C. W. NESBITT and C. B. CASSIDY for
appellant.

M. M. LOGAN, Attorney General, and D. O. MYATT, Assistant
Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE HURT—Reversing.

The appellant, James Crouch, upon an indictment, in
which, he was charged with the crime of wilful murder,
by shooting and thereby killing Sampson Wills, in the
town of Salt Lick, on the 24th day of December, 1915,
was tried and found guilty of voluntary manslaughter
by the verdict of the jury, and his punishment fixed, at
confinement in the state reformatory, for an indetermi-
nate period, of which the minimum was seventeen years
and the maximum eighteen years, and the court rendered
a judgment accordingly. Grounds were filed and a mo-
tion made to set aside the verdict and judgment and to
grant a new trial, but the motion was overruled and he
has appealed to this court and insists that the court erred
to the prejudice of his substantial rights: (1) By fail-
ing to properly instruct the jury. (2) By refusing to
admit competent testimony offered by him. (3) In re-
fusing to grant him a new trial.

For the purpose of determining whether his contentions are well founded, it will be necessary to set out the facts of the homicide, as disclosed by the evidence, and the things which were offered to be proven, which the court excluded and which are complained of as error. Sampson Wills, resided near to the town of Salt Lick, which was a town of the sixth class, and of which, at the time of the homicide, the appellant was marshal. On the late afternoon of the day upon which he lost his life, Sampson Wills and his son, Freeman Wills, a young man of twenty-one years of age, were in Salt Lick. The young man purchased a quantity of candy and fruits, which were placed in a basket, and father and son, about nightfall, went to the depot of the Chesapeake & Ohio Railway, at Salt Lick, to await the coming of the train. The train was not upon its scheduled time, and while they were waiting, the night set in. The young man was intoxicated to some extent and acting somewhat after the manner of one in that condition, but was not belligerent. He and his father and one or two others were standing near to each other, near the platform, at the depot, when Clarence Crouch and Joshua Crouch arrested him. Each took hold of him, by an arm, and started to take him to the town jail to incarcerate him. The appellant was not at this time present, and the arresting parties were not proceeding under his directions. At this point the evidence becomes somewhat contradictory. Freeman Wills testified that Clarence and Joshua Crouch said to him, "to go with them," and he replied, "all right." They took him by the arms and started, when his father, the deceased, asked, "where he was going." He replied, "I am going to jail." The father then said, "If this boy has done anything to be arrested for, I will pay his fine. If he hasn't the money, I will pay it," and then proceeded to follow along behind them. Clarence Crouch said, "Make them stand back." About that time the appellant ran up and said, "Stop," and then shot the deceased, who exclaimed when shot, "Oh, Jim, you have shot me for nothing;" that deceased was not armed and did not have a pistol, but was walking along behind his son and his captors, but when appellant said, "Stop," he did so and did not put his hand in his pocket before he was shot.

Lewis Pergram said that he was present when the homicide occurred, but was some twenty-five to thirty

steps away, but because of the darkness could not see the parties at the time. When Clarence Crouch took a hold of Freeman Wills, the deceased walked toward them. Some one said, "Stand back," then two shots were fired and the deceased said, "Jim, you shot me."

Ed White said that he was ten or fifteen feet from the parties when the homicide occurred, but because of the darkness could not see them. He heard the deceased say, "Hold on there, I will pay the fine." The appellant said, "Stop," and then a pistol was discharged twice. The appellant did not say, "Let them take him to jail," nor did the deceased say, "G—d d—n you, you have no advantage of me, I have a gun, too," nor anything similar to that expression.

The appellant testifying for himself, in substance, stated, that he was standing upon the platform of the depot and had been so standing for four or five minutes; the deceased and Freeman Wills were drunk; Clarence and Joshua Crouch arrested Freeman Wills, and they came along toward him with him; the deceased was following them and trying to pull Freeman Wills from them; "I told him to let them take his son to jail, that he was drunk," deceased turned around and said, "G—d d—n you, I have as good a pistol as you;" that deceased drew his pistol down on him and snapped it. "I shot and he came towards me and then his pistol fell on the ground and I took him to jail." Deceased did not have a basket upon his arm and it was too dark for one to see, who was more than five feet away.

Clarence Crouch stated, in substance, that he and Joshua Crouch were acting as deputy marshals, and arrested Freeman Wills because he was drunk and disorderly, and started toward the jail to put him in it. Deceased came within four or five feet of them and said, "Turn that boy loose." Appellant was within four or five feet of them and said to deceased, "Stay back, let them take him to jail." We had gotten from ten to fifteen feet away, but we were going from them and did not see the shooting.

Joshua Crouch stated, that it was so dark, that one could not recognize an acquaintance at a distance of more than five or six feet. When they were starting to the jail with Freeman Wills, the deceased jumped down from the platform and "told us to turn the boy loose, that he was not doing anything." Deceased came to within five or

six feet of us. Appellant said, "Stop, let them take him to jail, he is drunk, they ain't going to hurt him." Deceased started toward appellant and said, "G—d d—n you, you have no advantage of me, I have a gun, too." At the same time deceased made a movement with his hand, which the witness indicated, but the record does not disclose what the movement was. They had gotten ten or fifteen feet away from deceased and appellant, when the shots were fired, and witness could not then see them and did not see the shots fired.

John Doyle was twenty-five or thirty steps from the scene of the shooting, but because of the darkness could not see the parties at the time.

George Mays, testifying in rebuttal for the Commonwealth, stated, that about an hour before the deceased was shot he searched his pockets in an endeavor to find whiskey, but that deceased then had nothing in his pockets. The widow of deceased testified that at the time of the homicide the deceased did not own a pistol.

The appellant, after he shot the deceased, arrested him and put him into the jail. The deceased received two wounds. A bullet had penetrated his right hand, from the back of it, and came out in the palm of the hand. The other wound was from a bullet, which entered his body upon the front, just below the breast bone, and came out of his body about two inches to one side of the spinal column. He died from the effects of the wounds in less than an hour after they were received. The appellant gave as a reason for his not securing the pistol, which he claimed that deceased presented and snapped at him, was, that the pistol fell from the hand of deceased and rolled away and that the deceased was a larger man than he was, and left the inference, that he could not secure the deceased as a prisoner and his pistol, too. Proof was made by the Commonwealth that deceased did not have a pistol upon his person after his arrival at the jail nor after his death. The evidence failed to disclose that any one ever saw a pistol upon the ground at the place where the deceased was shot. It was at the railroad depot, where the presence of many different persons is a frequent circumstance.

(2) The court permitted Clarence and Joshua Crouch to testify that they were, at the time of the arrest of Freeman Wills, acting as deputy marshals, but refused to permit the appellant to testify that they were in fact

deputy marshals at the time, and of this the appellant complains. When objection was made to the statement by appellant, that Clarence and Joshua Crouch were in fact deputy marshals, the court caused the jury to retire and then heard such evidence as was offered as to whether they were deputy marshals, in the absence of the jury, and then sustained the objection to any proof that they were such officials, or had authority to so act, at the time of the arrest. It was disclosed by the evidence, which was heard by the court, in the absence of the jury, that Clarence and Joshua Crouch were not clothed with any authority as deputy marshals, and were not appointed such by the board of trustees of the town by an order or resolution, or by the authority of any resolution, which had been adopted by that body. The appellant testified that the members of the board of trustees of the town had authorized him verbally to appoint deputies. The appointment, under which, they were acting, was attempted to be made by the appellant, hence, without the concurrence or approval of the board of trustees. He merely directed them to go before a notary public and have him administer to them the oath of office, which they had done. This would not constitute them deputy marshals nor clothe them with any authority to act as such, or to perform the duties which are attached to such an office. As before stated, Salt Lick is a town of the sixth class. Section 3687, Ky. Statutes, which is a part of the charter of towns of such class, provides that the police force of such a town shall be under the direction and control of the marshal, and that for the suppression of riots, tumults, disturbances of the peace, or resistance to the laws or of the authorities of the town, in the exercise of their lawful functions, that the marshal shall be vested with the authority, which is by law, conferred upon sheriffs, and is entitled to the same protection; and his lawful orders shall be promptly executed by deputies, police officers, and watchmen, in the town; and every citizen should lend his aid, when required, for the arrest of offenders and maintenance of order, but there is no statute or law, which authorizes marshals to appoint deputy marshals for the town. A deputy marshal is an officer who may, upon his own initiative, make an arrest, when the marshal might lawfully do so, if he was present, and does not necessarily have to act under the immediate direction and authority of the marshal,

as a citizen, who is called upon by the marshal to assist him in the arrest of an offender or in the maintenance of the peace. Subsection 7, of Section 3704, Ky. Statutes, which defines the powers of the board of trustees of towns of the sixth class, after bestowing authority upon them to do the specific things mentioned in that section, authorizes them as follows:

"To do and to perform any and all other acts and things necessary or proper to carry out the provisions of this chapter, and to enact and enforce within the limits of such town all other local, police, sanitary and other regulations, as do not conflict with the general laws."

The authority to create the office of deputy marshal and to appoint one to fill it, it being a police measure, not in conflict with the general laws, and local to the town, is certainly, by the provisions of the subsection, *supra,* vested solely in the board of trustees of the town. If there was any doubt, as to the authority to appoint deputy marshals and other necessary police officers, in towns of the sixth class, it is resolved by the general rule, that wherever a power is conferred upon a municipal corporation by the legislature and no officer or person is expressly authorized to exercise such power, the common council of the municipality is the only authority which can exercise it. It is the general agent of the municipality. 28 Cyc. 317. Section 3696, Ky. Statutes, provides that the board of trustees, in towns of the sixth class, shall hold regular meetings, once each month, at such time, as may be designated by ordinance, and such special meetings, as may be called by the chairman of the board or by three members of it, by giving written notice to the members, at least three hours, before the time of the proposed meeting, and the meetings shall be public. Section 3698, Ky. Statutes, provides that the board of trustees shall cause a record to be kept by the clerk of the board of all of their proceedings. Where a public corporation, as that of a town, is required to keep a record of its proceedings the record is the only competent proof of its action, or at least until it is shown that a record was made and has been lost or destroyed. 17 Cyc. 506. The board could not delegate its authority to create the office of deputy marshal, and to select and appoint the one to hold it, to an agent, and does not act in such a matter, except by a resolution. The proof shows

that the board of trustees never made any appointment of a deputy marshal, or authorized any appointment by resolution or otherwise. Hence, the court was not in error in determining that Clarence and Joshua Crouch were not deputy marshals, and refusing to allow the parol evidence offered, in the attempted proof of that fact, or in refusing to instruct the jury that they were deputy marshals and authorized to perform the duties of that office.

However, under the facts of this case and the issue made, the status of Clarence and Joshua Crouch, whether as deputy marshals or mere volunteers, is not material. It does not appear, that they were, in anywise, acting under the direction of appellant, and appellant could not be excused for shooting and killing the deceased, except it was done in his necessary self-defense, and he relies alone on a plea of self-defense for his justification, and that is the sole issue for the jury in the case. The deceased was not excusable for attempting to take the life of appellant, if he did so, even if other parties had arrested his son, without authority, and appellant only admonished him to permit them to put him in jail, or to cease pursuing them.

(b) A more serious question, however, is presented by the refusal of the court to grant appellant a new trial. One of the grounds relied upon by him for a new trial was the discovery of important evidence in his favor after the verdict of the jury was rendered, and which he did not know of and could not, with reasonable diligence, have discovered before the trial. He accompanied the motion for a new trial with his own affidavit, and that of the witness, Dick Ferguson, by whom it is proposed to make the newly discovered evidence. It is well settled, that a new trial will not be granted on account of newly discovered evidence, unless the party who applies for a new trial files his own affidavit, which must show that he did not know of the newly discovered evidence and could not, with reasonable diligence, have discovered its existence until after the trial, and he must, also, file the affidavit of the witness or witnesses by whom it is proposed to prove the newly discovered facts, which must be set out in the affidavit or affidavits, of the newly discovered witness or witnesses. Bronson v. Green, 2 Duvall, 234; Bowling v. Com., 148 Ky. 9. It is, also, well settled, that a new trial will not be granted on account of newly

discovered evidence, which is merely cumulative. Bowling v. Com., *supra.* Except in certain extreme cases, a new trial will not be granted on account of newly discovered evidence, which can be only used for the purpose of impeaching witnesses, who have testified upon the trial. Prive v. Thompson, 84 Ky. 219; L. & N. R. R. Co. v. Uelchi's Admr., 126 Ky. 556; Riperdam v. Scott, 1 A. K. M. 151; Hays v. Com., 140 Ky. 184; Chambers v. Chambers, 2 A. K. M. 348; Rider v. Sullivan, 15 R. 749; Ellis v. Com., 146 Ky. 715. It is, also, well settled, that the newly discovered evidence, which will authorize a new trial, must be of such character, as to be reasonably calculated to have a decisive influence upon the evidence to be controverted by it, and a new trial will not be granted, if it is doubtful whether it will have any decisive influence upon the result of another trial. Hays v. Com., *supra;* Ellis v. Com., *supra;* Allen v. Perry, 6 Bush 85; Mercer v. Mercer, 87 Ky. 21. The appellant states in his affidavit, that before or during the trial, that he did not know that he could prove the facts to which Dick Ferguson would testify, either by Ferguson or any other person, and that he has learned for the first time, since his trial and conviction that Ferguson knew of the facts to which he will testify upon another trial, if a new trial is granted him. The affidavit of Ferguson discloses the fact, that he was present at the time appellant shot Wills; that a few minutes before the Chesapeake & Ohio train arrived at the depot, he saw two persons arrest another and start to go away with him and he saw another, whom he did not know, at that time, follow these parties and attempt to take the prisoner away from them; that James Crouch, the appellant, was standing on or near the platform, about thirty feet west of the ladies' waiting room, and when the arresting parties and the prisoner came opposite to the appellant, with the man following, whom the affiant afterward learned was Sampson Wills, the appellant stepped across the railroad track and said to Wills, "You stay back, they are taking your boy to jail, he is drunk;" that at this time Bogus Purvis was standing possibly nearer to the parties than affiant, who was within ten or fifteen feet; that when appellant accosted Wills, the parties with the prisoner went on, and Wills said, "G—d d—n you, you have got nothing on me, I have a pistol, too," and immediately took from his pocket an object, which looked to be a pis-

tol, and pointed it at appellant; just then affiant turned away, but heard two shots immediately, and heard some one say, "You shot me;" that appellant then took Wills on toward the jail; that Bogus Purvis then went to the place of the shooting and picked up something and walked away; that without having disclosed what he, Ferguson, knew of the occurrence or of his presence there, he removed to the state of Ohio, where he has since lived, but that he is willing to return and testify as a witness, and will state the facts as above detailed, and that same are true.

Considering that one of the facts, of which the appellant had no knowledge until after the trial, was that Ferguson was present when the homicide occurred; that the darkness, at the time was such, that a person could not be seen, only, for a few feet away; that appellant immediately came from the place of the shooting to the jail; that Ferguson, at once, went away from the place of the shooting and left the state without disclosing the fact, that he was present or knew anything of the occurrence, it does not appear that appellant could have, by reasonable diligence, have known of the testimony that Ferguson would give, until it was disclosed to him by some one, which he states was not done until after the trial. The testimony, which Ferguson proposes to give, bears upon the decisive facts of the homicide and from them the guilt or innocence of appellant can be most certainly determined. It is not cumulative or for the purpose of impeaching any witness, who testified upon the trial. The witnesses who testified upon the trial, with the exception of Freeman Wills, deposed that they either did not or could not, at the time the mortal wounds were given, see the appellant and the deceased, and it is reasonable to conclude, that other persons, if any there were, who may have been about the depot did not and could not see what transpired. The testimony of Ferguson will strongly corroborate that of appellant. Without expressing any opinion as to the weight to which the testimony of Ferguson is entitled, as that will be a question for the jury, the record does not disclose any reason why credence is not to be given to it, and under the peculiar facts of this case, it would be reasonably calculated to have a decisive influence upon the result of the trial of the case. While the appellant cannot require the witness to return to this

state, he may take and use his deposition, in the manner, provided by law for that purpose.

We, therefore, conclude that the court erred in not granting a new trial, that appellant might have the benefit of the testimony of the witness, Ferguson, and the judgment for that reason is reversed and remanded with directions to give the appellant a new trial.

All members of court sitting. Judge Clarke dissenting.