## Lawler v. Commonwealth.

(Decided November 26, 1918.)

### Appeal from Kenton Circuit Court.

1. Criminal Law—Change of Venue—Application for—Discretion.— The trial court is vested with a sound discretion in disposing of motions for a change of venue, and such discretion will not be interfered with unless shown by the record to have been abused; and where such motion made by the defendant was overruled and he introduced no evidence except the affidavits accompanying his petition, while the Commonwealth adduced proof by a substan-

tial number of credible witnesses that there existed no prejudice or feeling against the defendant in the county, the ruling of the court upon that motion will not be disturbed.

2.   Criminal Law—View by Jury of Place of Crime.—Permitting a jury to have a view of the place where the crime is charged to have been committed without the presence of the defendant is an error, but a reversal of a judgment of conviction on account of such error will not be made if it is affirmatively shown that the substantial rights of the defendant were not prejudiced thereby.

3.   Criminal Law—View by Jury of Premises.—While it is the duty of the court to swear the officer in charge of the jury while it is viewing the premises, the objection in this case that such oath was not administered is neither sustained by the proof nor by the record, since the latter, immediately following the order sustaining the motion for the view further recites: "The sheriff is sworn to take charge of the jury," it being presumed that that oath was administered in connection with a view of the premises.

4.   Criminal Law—Photographs.—It is claimed that a photograph of the defendant was permitted to remain on a table within the bar during the trial and that it had been taken from a rogues' gallery, and that it was error to permit it to be exposed to the view of the jury, but whether so or not it is not shown that any of the jury saw the picture or knew that it had been taken from a rogues' gallery, and the fact complained of, if it be true, is not under the circumstances an error.

5.   Criminal Law—Statement by Commonwealth Attorney.—While it was improper to permit the Commonwealth's attorney to state to the jury upon the voir dire examination that a life sentence would entitle the defendant to parole, yet it is doubtful if the error, owing to the wording of the question, was prejudicial. But if so it can not be considered, under provisions of sec. 281 of the Criminal Code.

6.   Criminal Law—Argument of Counsel.—The Commonwealth's Attorney in his closing argument to the jury is alleged to have said: "I believe James Lawler slew Andrew Nordmeyer"; "I don't care if you sentence him for life, you in your experience know what that means;" "If Lawler is given a life sentence he will be out in a few years, robbing and murdering again." An objection was sustained to the last two alleged remarks, which cured the error (if error it was), while the first remark is clearly permissible, so that this alleged misconduct of the attorney would not be prejudicial, conceding the record to be sufficient to present the alleged error, which is doubtful.

JOHN B. O'NEAL for appellant.

CHARLES H. MORRIS, Attorney General, and OVERTON S. HOGAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant, James Lawler, was tried and convicted under an indictment charging him and Patrick Carney, alias Kearney, with the murder of Andrew Nordmeyer, the jury fixing his punishment at death, and to reverse the judgment he prosecutes this appeal. Two men were killed upon the same occasion, John Rhem and Andrew Nordmeyer. Appellant and Kearney were jointly indicted under separate indictments for the killing of each of them, and the co-defendant, with appellant, was tried and convicted under the indictment for the murder of John Rhem. He prosecuted an appeal to this court, but the judgment was affirmed in the case of Carney, alias Kearney v. Commonwealth, 181 Ky. 443. In the opinion in that case the facts are very fully set out, and they will not be repeated here except in so far as may be necessary for an understanding of some of the questions raised.

The grounds urged for a reversal are (1) error of the court in overruling defendant's motion for a change of venue; (2) error in permitting the jury to view the premises without defendant being present; (3) error in failing to swear the officer in charge of the jury, and who accompanied it when the premises were viewed; (4) error in permitting what is called a rogue's gallery picture of defendant to remain on a table in the court room during the trial; (5) error in the admission of evidence; (6) because the evidence is insufficient to show that either defendant shot Nordmeyer, and (7) prejudicial misconduct on the part of the Commonwealth's attorney during the trial and in the argument of the case to the jury.

Taking these up in the order named: (1) Conceding that the petition for a change of venue filed by the defendant complied with the provisions of section 1110 of the statutes, the evidence heard upon that motion fully authorized the ruling of the court in denying it. A number of witnesses, among whom were some of the best and most substantial citizens of Kenton county, were introduced by the Commonwealth and emphatically stated that in their opinion there was no such prejudice against the defendant as would deprive him of a fair and impartial trial, or of a fair and impartial jury. While the Commonwealth's witnesses upon that hearing stated that there existed an indignant feeling against the perpetrator of the crime, still there was no adverse sen-

timent against the defendant, or any disposition to visit
punishment upon him, except it be proven that he was
one of the perpretrators of the murder. The motion for
a change of venue is one which addresses itself to the
sound discretion of the trial court, and it has a number
of times been said by this court that such discretion will
not be interfered with unless it clearly appears to have
been abused. Kearney v. Commonwealth, *supra;* Heck
v. Commonwealth, 163 Ky. 518; Howard v. Common-
wealth, 15 R. 874; Crockett v. Commonwealth, 100 Ky.
382. The situation here presented may be said to be
precisely the same as that presented in the Kearney case,
*supra,* and under facts quite similar it was there held
that there was no error in this regard. No change of
public sentiment between the Kearney trial and this one
is shown to have taken place. The only intervening fact
was the conviction of Kearney, which we cannot con-
ceive would affect the case as relating to the appellant.
We therefore conclude that this objection is not well
taken.

The (2) objection urged for a reversal was also pre-
sented in the Kearney case, since the defendant there
did not accompany the jury when it viewed the premises.
In that case, as in this, the objection was made for the
first time in the motion for a new trial, and as in that
case so in this, there was no refusal to permit the ap-
pellant to accompany the jury, since he made no offer
and expressed no desire to do so. On the contrary, the
motion for the view in this case was made by defend-
ant's counsel, and it was through his instigation that the
view was made. He not only had notice when the jury
would be conducted to the premises, but at the time he
was again notified and expressed his determination not
to attend. Upon the trial of the motion for a new trial
it was clearly shown that nothing was said or done by
the officer having the jury in charge, or by anyone else,
while the view was being made, except to permit the jury
to pass through the building where the tragedy occurred.

It is here insisted that counsel for defendant did not
learn of his client not accompanying the jury until after
the case had been submitted, but he did learn of it before
the jury arrived at a verdict, and in ample time to take
advantage of the error (if it be one) by moving for a
discharge of the panel and a continuance of the case.
This, however, was not done. But it is insisted that this

case differs from the Kearney case on this point, in that a view of the premises was calculated to furnish evidence on a vitally contested point, i. e., whether defendant or Kearney shot Nordmeyer, conceding both were present. This might be admitted to be true in some respects, but on the trial there was an absolutely correct plat of the premises introduced and used before the jury which showed the true location of doors and partitions referred to in the evidence and their relative positions toward each other, and we can not see how a mere look at the thing itself would be any more enlightening than what would be furnished by an admittedly correct drawing. Moreover, defendant's defense was an alibi, and if this was untrue the jury, under the evidence, could scarcely have arrived at any other conclusion than that either Kearney or defendant—most probably the latter—shot the deceased, Nordmeyer. Under the circumstances we feel compelled to follow the opinion of this court in the Kearney case rendered under practically the same facts.

Upon the (3) contention but little need be said. It is not certainly shown, independent of the record, that the officer having the jury in charge when it viewed the premises was not sworn as required by section 236 of the Criminal Code. But when we examine the record it is found to contain this recitation: "Defendant moves to permit the jury to view the premises; said motion is sustained. The sheriff is sworn to take charge of the jury." This statement as to the swearing of the sheriff made immediately in connection with and following the order sustaining the motion made by the defendant for the jury to view the premises, we must conclude was a swearing of the sheriff for that purpose.

The contention growing out of the (4) objection is that during the trial a Cincinnati policeman was introduced by the Commonwealth for the purpose of identifying a photograph of the defendant which the policeman was ready to say appeared in a rogue's gallery, but the court declined to permit that testimony to be introduced. The photograph of the defendant, according to the affidavit of his counsel, filed on the hearing of the motion for a new trial, was permitted to remain upon a table located within the bar, together with other papers thereon. Whether any of the jury saw this picture is not shown, nor are we informed whether the jury was suffi-

ciently near the table to permit any of them to see the picture, conceding that it always remained visible. Furthermore, if they had seen the picture there is nothing upon it (it having been filed with the record) to connect the defendant with any rogue's gallery or any other fact casting a reproach upon him. This fact, if error at all, is manifestly so nonprejudicial, trifling and technical as not to be entitled to serious consideration, and we find no fault with the judgment upon this ground.

Under the (5) ground contended for our attention is called to no testimony offered by the Commonwealth nor to the rejection of any offered by the defendant claimed to be erroneous, but counsel insists that a reading of the record will show such to exist. However, a close reading of the record has disclosed but few instances where the ruling of the court in either of the particulars mentioned was objected to by the defendant, and they are not of a substantial nature and clearly not prejudicial.

In considering the (6) objection it will be necessary to make a brief statement of some of the testimony. To begin with, there can be no reasonable doubt but that the defendant was present upon the occasion of the homicide, as will appear from the facts related in the opinion in the Kearney case, to which we refer. It might be added that the testimony upon this trial showed that at least four eyewitnesses identified defendant as being one of the burglars present and participating. An equal or greater number of witnesses identified the defendant as being in the city of Covington on that evening, some time between eight o'clock p. m. and the time of the commission of the crime, which occurred near nine o'clock. He went into a number of saloons and from each of them there were witnesses introduced who recognized him, some of whom had known him before, and who addressed him by his given name. In addition, two or three policemen of the city of Cincinnati, who arrested defendant at his residence in that city and where he swore he was on the fatal night, about twelve o'clock on the night of March 6, 1918, little more than twenty-four hours after the commission of the crime, stated that defendant refused to open the door and give them admittance; that they were compelled to and did force an opening of the outer door to defendant's residence and in the same way gained entrance into the room which he was occupying. They found him in his night robes with a pis-

tol in his hand, which they forced him to relinquish. The pistol very much resembled the one which eyewitnesses to the crime testified that defendant had. It was of the same caliber as that one, and cartridges were found in defendant's residence corresponding to others found at the scene of the tragedy. In addition, the officers say that when defendant was arrested he asked, "How many men did I kill?" True, defendant denies this and says in substance that he asked "How many men have you killed?" But as to what he said upon that occasion the evidence of the Commonwealth largely preponderates.

It is insisted that the testimony of the Commonwealth was not sufficient to authorize a finding that either Kearney or defendant shot Nordmeyer, conceding both were present. The premises where the killing occurred were located in Covington at the corner of Russell and Twelfth streets, the building consisting of three rooms, all of them facing Twelfth street, but only the front one, which was a saloon, fronting Russell street. The other two rooms back of the saloon faced Twelfth street, which ran east and west. The killing of Nordmeyer occurred at the door leading from the saloon into the room immediately at its rear, in which room were located parties collecting the building and loan dues. In the rear room was the chief of police of Covington and others who were holding an election of directors by the stockholders of the building and loan association. Defendant and Kearney first appeared in the rear room with drawn revolvers and demanded money. The chief of police informed them that the money was in the other or middle room, and the two then went into that room, where they presented revolvers at John Rhem, who appears to have been in charge of the money box. He attempted to save the money by removing the box from the table when, Kearney shot him. Almost immediately after that shot another was fired, but no witness seems to be able to state exactly who fired that shot, or in what direction it was fired, but it is conclusively shown, as we think, that the second shot was the one that killed Nordmeyer. A witness who was sitting at the table where the dues were being collected, and immediately behind whom Lawler took his position upon entering the room, testified that when the first shot was fired by Kearney at

Rhem, he, the witness, eased out of his chair and went behind the defendant, and that about that time the second shot was fired, but the witness continued to advance rapidly toward the saloon door and found Nordmeyer shot. Other witnesses say that when the second shot was fired the deceased was heard to say "Oh!" By the time the second shot had been fired the chief of police had procured his pistol and had either entered or was about to enter the middle room when a third burglar by the name of Moran opened fire on him. This resulted in a pistol duel between the chief of police and that burglar, in which the latter was killed and the chief of police was wounded in the face. Moran fired but three shots, all of which were aimed at the chief of police, in an opposite direction from Nordmeyer. The chief of police was not firing in the direction of Nordmeyer, and no one fired a shot upon that occasion except the chief of police, Moran and the two defendants in this indictment. Under this testimony the jury was abundantly authorized to find, as it did, that either Kearney or defendant fired the shot which killed Nordmeyer, the evidence being stronger that defendant fired it than that his co-defendant did so. We therefore conclude that this contention cannot be sustained.

In considering the last and (7) contention, it is insisted (a) that the Commonwealth's attorney was guilty of misconduct in a statement which he made to some of the jurors on their *voir dire* examination. In that statement the contemplated juror was informed that one convicted of a life sentence was under the law subject to be paroled after eight years' service in prison. Whether this was calculated to influence the juror for or against the defendant is problematical. A humane juror might be induced thereby to give the lighter penalty, while another less humane might thereby be induced to impose the heavier one. At any rate we think the question was improper, and the court should not have permitted it to be asked. We do not, however, regard it so prejudicial as was the imparting of similar information to the jury by the judge of the court, as shown in the case of Postell v. Commonwealth, 174 Ky. 272. In that case the jury had heard all the evidence and had deliberated on the case. The circumstances under which they were informed as to the parole law indicated that they were about to arrive at a verdict and such in-

formation was calculated to influence them. When the question was asked the juror in the instant case no evidence had been heard, and neither the degree of the offense nor the defendant's connection with it had been placed before the jury. We are of the opinion, however, that under the interpretation given to sec. 281 of the Criminal Code this alleged error can not be considered by us. Daniels v. Commonwealth, 154 Ky. 601; Powers v. Commonwealth, 114 Ky. 237 (page 275); Howard v. Commonwealth, 118 Ky. 1; Ellis v. Commonwealth, 146 Ky. 718, and Frasure v. Commonwealth, 180 Ky. 274.

In the Powers case referred to it is said: "The manner of selecting the jury, except as regulated by the statute, is within the control of the trial court. To its sense of fairness and desire to dispense that justice in trials whose essence is impartiality this question must be left."

In the Ellis case, upon the same point, it is said: "Construing this section of the Code in many cases, we have ruled that error—if there be one—in the manner of obtaining or selecting a panel is not available in this court, as the decision of the trial court on questions relating to the empaneling of jurors is not subject to exception. Howard v. Commonwealth, 118 Ky, 1. It must be admitted that this section and the construction given to it places great and unrestrained power in the hands of the trial judge in the selection of a jury, but it is not assumed that a judge will exercise it in an arbitrary or unjust manner or so abuse his office or discretion as to knowingly or purposely deny either to the Commonwealth or the accused the right to select a jury in the mode pointed out in the Code and statutes."

The latest utterance made by this court upon the question involved was in the Frasure case, wherein it is said:

"In construing this section we have time and again held that decisions of the trial court upon challenges to the panel or for cause, or as to the manner in which the jury is selected, or as to qualifications of jurors, are not subject to exception and the action of the trial court in respect to these matters, however erroneous or prejudicial to the accused, cannot be reviewed on appeal, although error of the court in respect to peremptory challenge is reviewable."

We therefore conclude that, acknowledging the impropriety of the question, and if it is conceded to be prejudicial, we are without authority to reverse the case upon this ground.

It is insisted (b) that the attorney for the Commonwealth was guilty of misconduct in remarks which he made to the jury in his closing argument. It is doubtful whether the alleged remarks are sufficiently before us to authorize their consideration, since in the bill of exceptions it is not stated that the objectionable remarks were certainly made, but that "during the course of said argument to the jury by the Commonwealth's attorney, counsel fer defendant objected to a statement which *he says* was made by the Commonwealth's attorney," &c. This is followed by the objectionable statements, the chief and only ones discussed in brief being: "I believe James Lawler slew Andrew Nordmeyer;" "I don't care if you sentence him for life; you in your experience know what that means," and "If Lawler is given a life sentence he will be out in a few years robbing and murdering again." In explanation of the last remark it might be said that Lawler while on the stand admitted that he had been convicted twice for felonies, and other times for misdemeanors.

It has often been said by this court that legitimate deductions from the testimony are permissible. With reference to the first statement above it is sufficient to say that the Commonwealth's attorney would have occupied a very doubtful attitude to be urging the jury for a conviction unless he believed that the defendant was guilty of the shooting. The very fact of his making the argument was a statement by his conduct of what he is alleged to have expressed in words, and if he thought the crime was of sufficient magnitude to require the death penalty, he had the right to say so, and to state the reasons why he thought the jury should fix that punishment rather than a life sentence, which might possibly be followed by the defendant's eventual release to become a prey upon society, as he had formerly been. But, however this may be, the objections to the statements were sustained except as to the one, "I believe James Lawler killed Andrew Nordmeyer." The making of that statement is denied by the attorney, and if made neither it nor the objections were heard by the court. Under

the circumstances we fail to see any prejudicial error in these objections.

Owing to the gravity of the punishment, and because of zeal of counsel, we have given this record close study. The defendant had the course of a useful, upright life before him. He did not choose to follow it, but rather to travel the devious path that leads to destruction. He has been shown to be guilty of a most atrocious murder, prompted by no other motive than robbery. The legislature, in providing for the death penalty for the crime of murder, realized that there were cases of sufficient magnitude to deserve the punishment of death. If there be such this case comes within that class. We must administer the law as we find it, and if one constructs for himself a bed of thorns, he has no one to censure but himself. We think there can be no doubt of defendant's guilt, and being the sole author of his condition, he must suffer the consequences, since we cannot find anything in the record to authorize our interference.

Wherefore, the judgment is affirmed, the whole court sitting.