## Hall v. Commonwealth.

(Decided February 6, 1925.)

### Appeal from Bourbon Circuit Court.

1. Criminal Law—Refusal of Change of Venue for Local Prejudice Held Not Abuse of Discretion.—Refusal of change of venue for local prejudice held not abuse of discretion, in view of Commonwealth's testimony in opposition to motion, statements of prospective jurors on voir dire examination, and Commonwealth's joinder with defendants in challenges for cause where prejudice was shown, though Criminal Code of Practice, section 281, precludes review of court's action in selecting jury.

2. Criminal Law—Refusal of Change of Venue Not Disturbed Without Clear Showing of Abuse of Discretion.—Change of venue rests within sound discretion of court, whose action will not be disturbed unless discretion is clearly shown to have been abused.

3. Criminal Law—General Verdict of Guilty on Several Counts Held Sufficient, where they all Charged Murder.—Verdicts, "We, the jury, find the defendant guilty of murder and fix his punishment at death," held to comply with Criminal Code of Practice, section 257, subsection 3, though there were seven counts in indictments, where all charged murder and each simply stated in different way how crime was committed.

4. Homicide—Verdict of Guilty, Without Specifically Stating Offense, Held Not Prejudicial Error.—Verdict, "We, the jury, find the defendant guilty and fix his punishment at death," held in substantial compliance with Criminal Code of Practice, section 257, subsection 3, and not prejudicial error in failing to state in terms that jury found him guilty of murder.

5. Homicide—"Malice Aforethought," Defined.—"Malice aforethought" means predetermination to commit act of killing with-

out legal excuse, and it is immaterial at what time before killing such determination was formed.

6. Criminal Law—Failure to Define "Feloniously" in Instructions, Not Reversible Error.—Failure to define word "feloniously" in instructions in murder prosecution is not reversible error.

7. Criminal Law—Instruction Not Requiring Belief Beyond Reasonable Doubt that Other Evidence Corroborated Accomplice, Held Not Erroneous.—Instruction that jury could not convict on accomplice's testimony unless they believed from evidence beyond reasonable doubt that there was other evidence corroborating accomplice, and tending to connect defendant with commission of crime, held not erroneous in not informing jury that such other evidence should be such as jury believed beyond reasonable doubt corroborated him, in view of accused's testimony to substantially same facts as accomplice, and Criminal Code of Practice, section 241, requiring that corroborating testimony be such as tends to connect accused with commission of crime.

8. Criminal Law—Argument for Death Sentence Held Not Reversible Error.—Argument of Commonwealth's attorney that jury could not impose punishment amounting to anything by sending man to penitentiary for life, where weak-kneed Governors and prison commissioners turned them out on community, and that only fit punishment for crime of character charged was death, held not so prejudicial to defendant's rights as to authorize reversal of murder conviction with death sentence.

9. Criminal Law—Newly Discovered Evidence Must Warrant Different Verdict to Authorize New Trial.—To authorize new trial, newly discovered evidence must satisfy court that, if heard by jury with other evidence, different verdict would have been returned.

10. Homicide—Newly Discovered Evidence of Accomplice Held Not Likely to Result in Different Verdict.—In prosecution for murder, newly discovered testimony of accomplice at his subsequent trial that he did not kill deceased nor fire shot as testified to by another accomplice and one with deceased at time of shooting, and shown by other evidence at defendant's trial, held not such as would have resulted in different verdict so as to warrant new trial.

11. Homicide—Persons Committing Murder in Effort to Rob Bank Held Not Entitled to Complain of Death Penalty.—Men arming themselves and going forth to rob bank, prepared to shoot if necessary, cannot complain of death penalty for killing peaceful, unarmed, law-abiding citizen, in effort to accomplish robbery.

JOHN B. O'NEAL and STEPHENS L. BLAKELY for appellant.

FRANK E. DAUGHERTY, Attorney General, and MOORMAN DITTO, Assistant Attorney General, for appellee.

Opinion of the Court by Judge Dietzman—Affirming.

On June 11, 1924, appellant, Elmer Hall, together with George Farrell, Richard Newhouse and Robert Mullen, left Newport, Kentucky, for Lexington in an automobile they had previously stolen in this latter named city. Hall had been released on April 15, 1924, from a penitentiary in Ohio, where he had served a term for robbing a storehouse. Newhouse had served a term in Greendale and also in the Frankfort penitentiary, and Farrell, on an amended charge of stealing an automobile, had served a term in jail. A few days prior to this June 11th, these men, with the exception of Mullen, had visited in the nighttime the bank of Clintonville in Bourbon county, where they made an attempt to blow the safe for purposes of robbery. In this they were unsuccessful. Returning to Newport they, after taking into their counsel Mullen, laid plans to hold up this bank in the daytime, and it was on this mission they left Newport on the morning of the 11th. They journeyed first to Lexington and after procuring oil and gas continued on their way to Clintonville. On arriving at this place, they found several automobiles in front of the bank, and so they drove on down the road a piece, turned around and waited for these machines to depart. After a little time, they saw that the coast was clear and then they drove back. All four men were heavily armed, most of them with 38's, but Newhouse with a 45. They admit that it had been agreed to shoot, if it became necessary in the course of their hold-up, but to shoot to wound only and not to kill, and not even to wound unless, as naively claimed, in order to protect themselves. When the automobile drew up to the bank, Newhouse, who had in the meantime masked himself, jumped out first, followed closely by Mullen and Hall, the latter of whom was carrying a satchel for the purpose of putting into it the money they hoped to get. Farrell, who had driven the automobile from Newport, remained in the machine at its wheel, ready to drive off the minute the hold-up was accomplished. Newhouse, in the lead, rushed into the bank. The lobby of the bank was in the shape of an L. The teller's cage fronted on the long arm and ran back with the short arm to the directors' room. At this time, there were only two people in the bank, Mr. Gibson, its cashier, and Mr. Frank Buchanan, the father-in-law of Mr. Gib-

son and a stockholder of the bank. They were then seated in the directors' room, to which Newhouse promptly made his way. When he appeared in the door, he covered the two men with his drawn revolver and ordered them to throw up their hands. Gibson at once complied, but Buchanan, who was unarmed, grappled with him. When Gibson saw Newhouse and Buchanan struggling, he turned to go into the teller's cage to get his revolver and as he did so he saw Newhouse shoot Buchanan once. Before he could get to his revolver he heard Newhouse fire a second shot and thereafter he was fully occupied in exchanging shots with Hall and Mullen, who, by this time, had gotten into the lobby. During the fusillade, Hall was wounded in the face and Newhouse, to whom Buchanan in his death throes clung, retreated through the lobby out into the pike, where he shook off Buchanan, who fell dead in the road. Hall and Mullen also fled and the three men made all haste to get back into their machine. As they got in Mullen was wounded in both feet, Hall accidentally shooting him in one foot and Gibson wounding him in the other. As Newhouse jumped in, he said, according to his companions, that he had killed two men. The machine at once drove off. As it disappeared down the road, Gibson fired the last shot he had in his revolver and hit the rear panel of the car but wounded no one. In the late afternoon, the four men reached Newport, where the wounded received medical attention. Newhouse and Farrell took the automobile in which the trip had been made to the outskirts of the city and there set fire to it. Farrell then went back to his companions, but Newhouse fled the country and made his way to Hoboken, New Jersey, where he was later apprehended. That night Hall, Farrell and Mullen were arrested, and after due time were, with Newhouse, each indicted for murder. On the separate trials of Hall, Farrell and Newhouse, each received the death sentence, from which verdict and judgment they have appealed.

But for the solemnity of the sentence imposed upon these men, little need be said of the points upon which they rely for a reversal of the verdict and judgment. The facts detailed above were proven beyond a peradventure of a doubt by noninterested witnesses, and the case was riveted by Mullen, who voluntarily went upon the stand and testified for the Commonwealth. Furthermore, the defendants themselves, in testifying, admitted all the facts brought out by the Commonwealth and confessed.

their guilt. We except from this statement Newhouse
who, though admitting the other facts, denied he had
fired any shot in the melee. Their attorneys, who did all
for these men that skillful and honorable counsel and offi-
cers of the court could do, frankly state that they had
and have no hope of ever acquitting these men, but only
of saving their lives, and to this end they rely upon cer-
tain alleged errors occurring on the trial in the lower
court, which, in deference to the severity of the punish-
ment imposed, we will discuss in detail and at some
length.

## I. CHANGE OF VENUE.

Motions for a change of venue were filed in the Hall
and Farrell cases and, by agreement, heard together on
the same proof. The trial court overruled these motions
and this is the first error alleged.

In support of their motions, the defendants filed
their own affidavits supported by the affidavits, almost
formal in their nature, of two residents of Campbell
county. Although these affidavits had the effect of re-
quiring the Commonwealth to make a showing, they were
so incomplete and inconclusive in their nature as to com-
pel but little rebutting testimony to offset them. These
affidavits were the only proof offered by the defendants
in support of their motion, except such facts as they claim
they brought out on cross-examination of the witnesses
offered by the Commonwealth in opposition to this mo-
tion and on the *voir dire* of the jurors summoned to try
their cases. In opposition to the requested change of
venue, the Commonwealth introduced eleven witnesses,
including the sheriff, a former county judge, a merchant,
an insurance man, some farmers and others. It is true, as
appears from their testimony, that the crime committed
by these men on account of its spectacular nature had
been given the widest publicity not only in the local press
of Bourbon county but also in the metropolitan press of
Cincinnati, Lexington and Louisville, which circulated
throughout central Kentucky. It is also true that one
paper in Bourbon county, the Paris Democrat, had advo-
cated the lynching of these men, but it is shown that this
editorial was condemned by the people of Bourbon
county; that not the slightest violence was offered to-
wards any of these defendants and that the trials, when
had, proceeded in an orderly and well-mannered fashion.

Indeed, a son of the murdered man himself acted as one of the guards provided for these men by the sheriff out of an abundance of caution, and it is shown in the record that he acted with most touching consideration towards the wounded defendants in assisting them in and out of the courthouse. Bourbon county is surrounded by counties like unto it in wealth and education, and it would have been almost impossible to have found a county to which to send this case on a change of venue where the citizenry did not know as much of the newspaper accounts as did the citizens of Bourbon county itself. Mr. Buchanan was not widely known. Juror after juror summoned for service in these cases testified that they did not know him. Nor were his family connections widespread. Although the case had been much discussed and many people had formed the opinion that the men arrested were the men who had held up the bank, as indeed they were, yet it is shown that prospective jurors could be and were found who knew nothing of the case or who had formed no opinion or who, if they had formed an opinion from newspaper accounts, were willing and could and would lay aside this opinion and try the case on the evidence produced in court. Although we are precluded under section 281 of the Criminal Code from reviewing the action of the trial court on the matter of selecting the jury, it may be said in passing that the Commonwealth was very fair in joining the defendants in challenges for cause where any prejudice was shown on the part of the talesmen, in the endeavor to get a fair and impartial jury to try these cases. The evidence in this case convinces us that the court did not abuse a sound discretion in refusing to grant a change of venue. As said in the case of Vaughn v. Commonwealth, 204 Ky. 229, 263 S. W. 752, the matter of change of venue "rests within the sound discretion of the court and unless that discretion is clearly shown to have been abused the action of the court will not be disturbed." An illuminating discussion of the principles involved in this question of a change of venue may be found in Bryant v. Commonwealth, 202 Ky. 427, 259 S. W. 1038, where the court said:

> "Upon the hearing of this motion (change of venue) fourteen witnesses testified for the Commonwealth that in their judgment a fair and impartial trial could be had in Breathitt county, while for the defendant five witnesses testified to the contrary.

We cannot, therefore, say that the court abused a sound discretion in overruling the motion, unless, as is contended by counsel for the defendant, certain facts testified to by his witnesseses are so conclusive of a county-wide prejudice against the defendant as to render the mere expression of opinion by any number of witnesses that he could obtain a fair and impartial trial of but little, if any, probative value.

"These facts are that the killing by defendant of his wife and a young man named Sam Lyons, in a store in Jackson, at about seven o'clock in the evening, greatly excited the community against him; that there was some talk of mobbing him; that the account of the double killing published in the local paper was unfair to him, and circulated generally throughout the county; that an untrue statement was published in a Lexington paper to the effect that he had offered to confess his guilt and accept a sentence of life imprisonment in the penitentiary, and that this paper was widely circulated and read throughout Breathitt county; that both of his victims were widely connected by blood or marriage with many prominent and influential citizens of the county, and that defendant was a laboring man, practically without means or influential connections of any kind.

"Conceding that a decision of whether or not a fair and impartial trial can be had in the county where the homicide occurred may depend upon proven facts rather than expressions of opinion by individuals, . . . it is nevertheless true that it is only in exceptional cases that this court will reverse the decision of the trial court when supported by the weight of opinion evidence, since the question is at last one of opinion that of necessity must be and is addressed to the sound discretion of the trial court, who occupies a much better position than we do to judge whether the hostile sentiment, always existing to some extent against a defendant charged with murder, so pervades the entire county as to prevent a fair trial.

"With reference to the facts detailed above as proven by the defendant, the Commonwealth showed that the talk of mob violence originated with a drunken man at the time and in the immediate vicinity of the homicide, was confined to a few irresponsible people and had entirely subsided long before the

trial. The account of the killing in the local paper does not materially differ from the Commonwealth's evidence on the trial, and, after a careful consideration of all of the evidence, we find ourselves unable to say that the court abused a sound discretion in denying appellant's motion for a change of venue.''

It seems to us that this opinion, sound in reasoning, is conclusive of the question raised by the defendants on their motions for a change of venue, and we cannot say that the lower court abused the exercise of its sound discretion in denying that motion.

## II. Indictment and Verdict.

A demurrer was interposed to the indictments in the lower court, but no mention is made in briefs of counsel of any errors in these indictments, nor have we found any.

It is earnestly urged, however, that the verdicts of the jury in these cases do not comply with section 257, subsection 3, of the Criminal Code, which provides: ''Upon a plea of former acquittal or conviction (a general verdict) is 'for the Commonwealth,' or 'for the defendant,' and, if for the Commonwealth, fixing the offense and degree of the offense, and the punishment in cases in which the jury is required to determine the degree of punishment.'' In the Hall case, the verdict of the jury was: ''We, the jury, find the defendant guilty and fix his punishment at death.'' In the Farrell case, it was: ''We, the jury, find the defendant guilty of murder and fix his punishment at death;'' and in the Newhouse case the verdict was like the Farrell verdict. So far as the Farrell and Newhouse cases are concerned, it is clear that the verdict complies with the requirements of the Code. Although it is true there were seven counts in the indictments, yet as they all charged murder and each count simply stated in a different fashion the way in which the same murder had been committed, it was not necessary for the jury to state on which particular count it found its verdict, as the Code makes no such requirement. In the Hall case the verdict is not in strict compliance with the Code, but this question has been passed on so many times by this court as to be no longer an open question. In the case of Winburn v. Commonwealth, 181 Ky. 183, 203 S. W. 1073, in passing on this identical question, we said: ''While it is true that the jury did not in

terms find the appellant guilty of murder, yet they were told that if they found him guilty of murder they should fix his punishment at death or confinement in the penitentiary for life. By fixing his punishment at life imprisonment, which they were not authorized to do unless they found him guilty of murder, it is certain from the verdict that the jury intended to find, and did find, him guilty of murder, and the mere failure of the verdict to state in terms that such was their finding cannot be regarded as prejudicial error." To the same effect is Hays v. Commonwealth, 12 Ky. L. R. 611, 14 S. W. 833; Patterson v. Commonwealth, 99 Ky. 610, 5 S. W. 765; Maiden v. Commonwealth, 203 Ky. 446, 262 S. W. 588.

The case of Farris v. Commonwealth, 90 Ky. 637, 14 S. W. 681, is not in conflict with these cases. In this case, Farris was indicted for storehouse breaking, the punishment of which was identical with that for the crime of grand larceny. In the indictment it was alleged that Farris had broken into a storehouse and carried off certain goods, wares and merchandise of a greater value than $20.00. A demurrer was interposed to the indictment on the ground that it stated two offenses, storehouse breaking and grand larceny. The court, however, overruled the demurrer holding that the averment concerning the taking of the goods was simply to show the intent of the breaking and that the only crime charged was that of storehouse breaking. Rather curiously, when the case came on to be tried, the court instructed not only on the crime of storehouse breaking but also on that of grand larceny, a crime which it had held was not embraced in the indictment. The jury returned a verdict which read: "We, the jury, find the defendant guilty as charged in the indictment and fix his punishment at three years in the penitentiary." From this verdict it was impossible to say whether or not the verdict of guilty was for the crime of storehouse breaking with which he was legally charged or for the crime of grand larceny with which the court had held he was not charged. Therefore, the judgment was properly reversed on account of the indefiniteness of the finding.

In this case the indictment charged Hall with murder. The instructions only submitted the questions of murder, manslaughter and innocence. In finding the defendant guilty and fixing his punishment at death, which punishment could be inflicted only in the event the jury found him guilty of murder, the jury unerringly indi-

cated the offense of which it found Hall guilty and so, under the doctrine of the cases above cited, the verdict substantially complied with the Code and there was no prejudicial error in its failure to literally comply.

## III. Instructions.

The instructions are criticised in several respects, the first of which is that the definition of "malice aforethought" is erroneous and inadequate. The trial court defined "malice aforethought" as follows: "The words 'malice aforethought' mean predetermination to commit the act of killing without legal excuse and it is immaterial at what time before the killing such a determination was formed." This definition is the one that has been approved time without number by this court, by all the text writers, and is substantially the same as the approved form in section 745 of Hobson, Blain and Caldwell's Instructions to Juries, where the authorities in its support are collected and may be found.

The next criticism is that the court omitted to define the word "feloniously" found in the instructions. However, it is well settled now in this state that it is not reversible error to omit the definition of this word. See Collier v. Commonwealth, 160 Ky. 338, 169 S. W. 740.

Lastly, it is said that in instructing the jury concerning the testimony of Mullen, an admitted accomplice, the court told the jury that they could not convict the defendants upon his testimony "unless the jury believe from the evidence beyond a reasonable doubt that there is other evidence corroborating the said Robert Mullen and tending to connect the defendant with the commission of the crime and the corroboration is not sufficient if the same merely shows that the crime was committed and the circumstances thereof." Although this instruction is substantially the same as approved by this court in a number of cases (see Hobson, Blain and Caldwell's Instructions to Juries, section 820), yet counsel contends' that the court should have told the jury that the other evidence which corroborated Mullen should be such evidence as the jury believed beyond a reasonable doubt corroborated him. In answer to this, we may say, in the first place, that in the case of Finch v. Commonwealth, 29 Ky. L. Rep. 187, 92 S. W. 940, this court held that it was not prejudicial error to fail to instruct that no conviction could be had on the uncorroborated testimony of an ac-

complice where the accused himself testified to substantially the same facts as the accomplice. In the second place, section 241 of the Criminal Code provides that the corroborating testimony must be such as tends to connect the accused with the commission of the crime. In Commonwealth v. McGarvey, 158 Ky. 570, 165 S. W. 973, this court said: The "test of the sufficiency of corroboration of the testimony of an accomplice" is: "Eliminate from the case the evidence of the accomplice and then examine the evidence of the other witnesses with the view to ascertain if there be inculpatory evidence—evidence tending to connect the defendant with the offense. If there is, the accomplice is corroborated." In these cases at bar, the court told the jury that it must believe from the evidence beyond a reasonable doubt that there was evidence other than that of Mullen tending to connect the defendants with the commission of the crime charged. If the jury believed that, then, under the McGarvey case, Mullen was corroborated. Hence there is no merit in the criticism of this instruction.

## IV. ARGUMENT OF COUNSEL.

It is next claimed that these cases should be reversed on account of the alleged improper argument of the Commonwealth's attorney. The substance of the argument objected to is that he told the jury several times they could not impose a punishment which amounted to anything by sending a man to the penitentiary for life where weak-kneed governors and prison commissioners turned them out on the community, and the only fitting punishment for a crime of this character was death. This whole matter was reviewed in the case of Bolin v. Commonwealth, 206 Ky. 608, 268 S. W. 306. In passing on an exactly similar contention in that case, this court said:

"Lastly, it is insisted that the statement (similar to the one in the case at bar) was both erroneous and sufficiently prejudicial to authorize a reversal of the judgment, and in support of that contention a number of cases from this court are cited, the most pertinent and perhaps the strongest one being Chappell v. Commonwealth, 200 Ky. 429, 255 S. W. 90. Another one bearing directly upon the objectionable feature of the statement is that of Postell v. Commonwealth, 174 Ky. 272, 192 S. W. 39. In neither of those cases was the judgment reversed on account of

the jury being informed as to the probable consequences of a life imprisonment, although it was held in them that so informing the jury was improper and that the practice should not be indulged in. In the case of Bailey v. Commonwealth, 193 Ky. 687, 237 S. W. 415, in commenting upon the rule circumscribing the latitude of the Commonwealth's attorney in his argument to the jury, we said that it 'does not require that the prosecuting attorney shall withhold from the jury his views touching the extent of the punishment which he in good faith believes the enormity of the crime merits.' And in the case of Lawler v. Commonwealth, 182 Ky. 185, 206 S. W. 306, in commenting upon the same subject, we said: 'If he (the Commonwealth's attorney) thought the crime was of sufficient magnitude to require the death penalty, he had a right to say so, and to state the reasons why he thought the jury should fix that punishment rather than a life sentence, which might possibly be followed by the defendant's eventual release to become a prey upon society, as he had formerly been.' Perhaps those excerpts were intended to apply to comments of the Commonwealth's attorney as based upon the facts and circumstances proven in the case, and did not attempt to justify references by the Commonwealth's attorney in his argument to the consequences flowing from the due administration of other departments of the state and which would possibly follow the infliction of a different punishment, and it was for that reason that the practice was condemned in the Postell v. Chappell cases *supra*. But, after all, we are not authorized to reverse a judgment of conviction under express code provisions unless the error complained of was so prejudicial to the rights of the defendant as to authorize it.

"If the defendant in this case committed the deed for which he was convicted (and there is abundant testimony to establish it), then he has but little grounds to complain of the infliction upon him of the severest punishment, for, according to the testimony of the Commonwealth, the deed with which he was charged was a cold-blooded assassination, without the pretense of provocation, and the only fact that the jury was called upon to determine was whether he was the perpetrator; and it is our conclusion,

reached after a careful study of the entire record, that we would be unauthorized to reverse the judgment of conviction upon the sole ground now under consideration.''

We regard the Bolin case as conclusive of this alleged error urged by appellant.

### V.  NEWLY DISCOVERED EVIDENCE.

Lastly it is urged that new trials should have been granted in the Hall and Farrell cases on the grounds of newly discovered evidence. On the trial of these cases, no one questioned the fact that Newhouse had killed Buchanan. Mullen so testified, Gibson so testified, and the defendants so testified. When Newhouse was put on his trial, he having been captured in New Jersey while Hall and Farrell were being tried, he testified that he never fired any shot and that it was Gibson who had killed Buchanan while firing at Newhouse. Thereupon Hall and Farrell made motions to grant them a new trial on the ground that Newhouse had not killed Buchanan or ever fired a shot.

The rule is that to authorize a new trial on the grounds of newly discovered evidence the new evidence must be such as to satisfy the court that if heard by the jury along with the other evidence a different verdict would have been returned. Mitchell v. Commonwealth, 195 Ky. 819, 243 S. W. 1028. Crouch v. Commonwealth, 172 Ky. 463, 189 S. W. 698; Gravitt v. Commonwealth, 184 Ky. 429, 212 S. W. 430; Ray v. Commonwealth, 184 Ky. 800, 212 S. W. 908. The testimony on the trials of both Hall and Farrell showed that Buchanan was hit three times, once in the breast, once in the groin and once in the right arm. Gibson fired his gun five times, four of the shots being accounted for. One hit Hall in the face, one hit Mullen in the foot, one went into the rear panel of the automobile and one hit the window sill in the bank. Gibson was using a 38 and Newhouse a 45. Mullen testified unequivocally that Newhouse shot Buchanan. Gibson testified that he saw Newhouse shoot Buchanan once and heard Newhouse fire a second shot. Gibson denied that he shot Buchanan. Newhouse admits that he was using a 45, and on his trial, when it was first discovered that he claimed he did not shoot Buchanan, a witness testified that the wounds on Buchanan were measured by him and found to have been inflicted by a 45 caliber bullet. It is

obvious from this statement of facts that the alleged newly discovered evidence of Newhouse does not measure up to the requirements of the rule above announced, and that the lower court did not commit error in refusing to grant a new trial on this ground.

It will be seen from reading this opinion that the errors relied upon for a reversal in nowise go to the real merits of the case. These men armed themselves and went forth to rob a bank; they were prepared to shoot if necessary, and in the endeavor to accomplish their purpose they killed a peaceful, unarmed and law-abiding citizen. The jury has inflicted upon them the severest penalty known to the law. Of this they have no real right to complain so long as the law is written as it is.

Judgment affirmed. Whole court sitting.