### Seymour v. Commonwealth.

(Decided June 3, 1927.)

Appeal from Jefferson Circuit Court
(Criminal Division).

1.  Criminal Law.—In prosecution for murder, where court overruled first motion for continuance, and new counsel, in making second motion for continuance, gave no reason why a continuance should be granted, and supported the motion by no affidavit or other showing, and defendant entered upon the trial without further motion or objection, it was not error to put defendant on trial on the day originally set therefor.

2.  Criminal Code.—Court of Appeals has no power to review trial court's overruling of a challenge to a juror for cause, under Criminal Code of Practice, section 281, providing that decision of court on challenges for cause shall not be subject to exception.

3.  Criminal Law.—Where deputy sheriffs took entire jury to a barber shop in order that some of the jurors might be shaved, and there were present only the jurors, the deputy sheriffs, and the barbers, except defendant's counsel, who came for his laundry and departed at once, and there was no conversation respecting case, reversal held not required on the ground of misconduct and permitting jury to separate.

4.  Criminal Law.—Where improper argument by assistant commonwealth's attorney was not relied on by defendant in his motion

for a new trial, such improper argument might not be considered on appeal.

5. Homicide.—Conviction of wilful murder held not against the evidence, on the ground that the evidence was insufficient to show that defendant had mental capacity to commit the crime.

6. Homicide.—Jury's finding that defendant had mental capacity to commit wilful murder is binding, where it is sustained by substantial evidence.

H. W. PHIPPS for appellant.

FRANK E. DAUGHERTY, Attorney General, and MOORMAN DITTO, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

From a judgment adjudging him guilty of the offense of wilful murder and imposing the penalty of death, the appellant appeals.

The facts of the homicide are admitted. The deceased, Wm. Schanzenbacker, was a scale tender for the St. Bernard Coal Company in its coal yards in Louisville, Ky. He collected each day a large sum of money for sales of coal, and it was his custom on quitting in the late afternoon to take his daily receipts home with him in a tin box. There worked in the coal yards with him a man by the name of Huddelston, the father of Wm. Huddelston. The latter knew all about Schanzenbacker's custom of taking this money home. Wm. Huddelston and the appellant, a boy 19 years old, were friends. Shortly before the homicide, while these two young men were riding around in an automobile, Huddelston broached the subject of robbing Schanzenbacker, and the two boys agreed that they would do so. On the day before the one set by them for the robbery, the appellant stole a license tag from an automobile; his purpose being to substitute it for the license tag on the automobile of Wm. Huddelston's father which these boys planned to use in the contemplated holdup. The purpose of the substitution of the stolen license tag was to prevent identification. However, due to hurry and oversight, the license tags were not interchanged.

On the day of the homicide the two boys met in the early afternoon, got into the Huddelston machine, and then drove around the city for awhile. As evening approached, they went to the vicinity of the coal yards of the St. Bernard Coal Company and there parked their machine but remained in it. Schanzenbacker had a Ford

car in which he rode to and from his work. His day's work being done, Schanzenbacker got into his Ford car carrying the tin box with his day's receipts in it and drove to his home. Arriving at his destination, Schanzenbacker got out of his car and started across the sidewalk. Huddelston and the appellant had followed him in their automobile from the coal yard and had stopped their car some distance back from the entrance to Schanzenbacker's home. The boys agreed that as Schanzenbacker knew Huddelston, the latter should remain in the car while the appellant did the robbing, so that Schanzenbacker might not be able to identify his assailant. The appellant had in his possession a pistol he had bought some two or three weeks previous. Huddleston also had a pistol of much larger caliber, and it was agreed that they would exchange pistols, and that the appellant should use the larger pistol in the holdup, because "it would put more fear" in Schanzenbacker. The appellant, with the large revolver, alighted from the Huddleston car, ran up and met Schanzenbacker as he was about to go up the steps into his yard. Pointing the revolver at Schanzenbacker, the appellant demanded of him the box. Schanzenbacker started to run, and, as the appellant claims, threw his hand to his hip. Appellant says that he then became scared, that without any design on his part his finger spasmodically contracted on the trigger of the revolver, that everything went black before him, and that, when he came to he discovered that he had fired the revolver six times, the gun hanging on the seventh load. It was shown in the evidence, however, that this gun would not fire unless there was muscular action on the part of the finger on the trigger each time a load was exploded. One of these six shots hit Schanzenbacker, and from the consequent wound he died about a week later.

After firing the shots, the appellant, without securing any money, ran back to the Huddelston car, and the boys fled from the scene of the holdup. They later separated, each going to his own home. A bystander got the license number of the Huddelston car as it left the place of the homicide, and from this number the police were able to trace the car to Huddelston's home. They there found the Huddelston boy. After some little parley, he broke down and confessed his part in the robbery and shooting of Schanzenbacker, and informed the police of the name of his accomplice. Taking Huddelston with

them, the police then went to appellant's home. The Huddelston boy called to the appellant, and the latter came out of the house. The police at once put him under arrest, though appellant at that time professed ignorance of why he was being arrested. One of the bystanders at the place of the homicide had stated that the man who did the shooting wore a light overcoat. The appellant when the police arrested him at his home had on no overcoat, and so the police told him that, as they would have to take him to the station house, he should put on his overcoat and come along. The appellant put on a very old and dilapidated overcoat, whereupon the police asked him why he did not put on his light overcoat. He replied that he had none, and the police then stated that they would have to search the house. He asked them if they had a search warrant and they responded that they did not need any. Seeing that they were about to search the house, the appellant went and put on the light over-coat he was wearing at the time of the shooting, and in the pocket of which was discovered the small pistol. On being taken to the station house and there informed of Huddelston's confession, the appellant likewise confessed. The sole defense on the merits in this case was a plea of insanity, but, in addition to the appellant's argument on this branch of the case, he likewise urges certain procedural objections as grounds for a reversal.

First, he contends that the court erred in overruling his motion for a continuance. When appellant was first arrested, he was represented by Mr. Charles Lamb, an attorney of the Jefferson county bar. When appellant was arraigned, the record shows that by consent of his counsel the case was set for trial on the day it was subsequently tried. On the following day, however, Mr. Lamb appeared in court and made a motion for a continuance, which motion he supported by his affidavit setting up facts tending to show that he could not get ready for trial in the time intervening between the arraignment and the date set for trial. This motion was overruled. The next day Mr. Lamb appeared in court, and on his motion his name was stricken from the record as counsel for the appellant. Mr. Lamb withdrew from the case on the ground, as he stated in his motion, that new counsel, who had been employed by the appellant, insisted on presenting as the defense in this case the plea of insanity, and that, as he (Mr. Lamb) did not contemplate trying

this case on that theory, he could not consent to taking part in a trial based on such defense. On the day following this, the appellant's new counsel made a motion for a continuance, but gave no reason why he desired such continuance, nor did he support his motion by any affidavit or other showing. This motion was overruled. On the day of the trial, the appellant, without objection or motion for a continuance, entered into the trial of his cause. It is obvious from this statement of the facts that there is no merit in his first contention that the trial court erred in trying him on the day it did. Kelly v. Commonwealth, 165 Ky. 483, 177 S. W. 249.

Appellant next contends that his challenge to one of the jurors for cause should have been sustained, but section 281 of the Criminal Code precludes our review of the court's action in this regard. It was so expressly decided in Harris v. Commonwealth, 214 Ky. 787, 283 S. W. 1063.

It is next contended that the court should have discharged the jury which tried the appellant because of misconduct on its part and because it was allowed to separate. The facts on which this contention is based are these: The trial of the appellant occupied several days. One morning just after breakfast, and before court opened, the deputy sheriffs in charge of the jury took the entire jury to a barber shop in order that some of the jurors might be shaved. No one was present in the barber shop but the jurors, the deputy sheriffs, and the barbers, except appellant's counsel, who by chance came into the shop to get his laundry. He did get his laundry and at once departed. No one talked to the jurors about this case nor did they talk with any one about the case. In Wynn v. Commonwealth, 188 Ky 557, 222 S. W. 955, where a contention like the present one of the appellant was made, it appeared that the jurors attended in the evening a special attraction at a skating rink in Henderson, and that one of the jurors, being an expert musician, was permitted to assist the musicians on that occasion. It was shown, however, that this juror remained in full view of the sheriff and the rest of the jurors all the time, and that no communication passed between any of the jury and any outsider about the case on trial. In declining to hold that the described conduct was a valid ground for reversal of the verdict in that case, we said:

"It is well recognized that a jury in a criminal case in charge of the sheriff may properly be taken

to places of amusement, to restaurants and the like, and that the temporary withdrawal of a juror from the immediate presence of his fellow jurors or the sheriff will not constitute such separation as will affect the verdict where, as in the present instance, the juror of whom complaint is made was, during the whole evening, within plain view of the sheriff and the remaining jurors, and at a distance of not exceeding 30 or 40 feet. . . . The mere opportunity to converse with a juror, nothing else appearing, is not sufficient to secure a new trial.''

In Johnson v. Commonwealth, 179 Ky. 40, 200 S. W. 35, it was held that the fact that two jurors in a homicide case were allowed to go to a drug store to purchase tobacco, the other jurors and the sheriff in whose custody the jury was remaining outside where they could see into the store, did not warrant the granting of a new trial, where no communication passed between any of the jurors and any outsider concerning the case on trial. These cases are conclusive of the ground urged in this case. If jurors may go to restaurants and places of amusements in charge of the sheriff, surely they can be taken to a barber shop to be shaved.

Coming to the next contention, we find that in his closing argument to the jury the assistant commonwealth's attorney said:

"You know what happens in these life sentences. They get out and lead a life of crime and go out and kill some other citizen.''

We are surprised that the commonwealth's attorney indulged in this argument, since in a long line of cases we have unhesitatingly condemned like arguments. Estepp v. Commonwealth, 185 Ky. 156, 214 S. W. 891; Chappell v. Commonwealth, 200 Ky. 429, 255 S. W. 90; Bolin v. Commonwealth, 206 Ky. 608, 268 S. W. 306; Hall v. Commonwealth, 207 Ky. 718, 270 S. W. 7, and the cases therein cited. We are equally as surprised that the trial court overruled the objection of the appellant's counsel to this argument. Nothing that we could here say could add anything to what we have said in the opinions cited in condemning arguments like the one in question. The very fact that we are called on so many times to discuss this question, as the number of these opinions show, induce the belief that many of the commonwealth's

attorneys are not heeding as they should our ruling in this matter. We are loath to believe that such action on their part is encouraged because these arguments, although condemned, have under the particular facts in the cases involved been held by us not so prejudicial as to warrant a reversal. But the trial courts should not wait for this court to be finally confronted with a case where such an argument will be so prejudicial as to require a reversal, but should themselves discipline commonwealth's attorneys who will not abide by the rulings of this court in this matter. However, inasmuch as the appellant did not rely on this error in his motion and grounds for a new trial, we are precluded from examining into it.

The last contention of the appellant, while not framed in exactly these words, yet essentially is a contention that the verdict is flagrantly against the evidence. He insists that the evidence in this case overwhelmingly establishes his incapacity to commit the crime of ''wilful murder.'' The evidence for the appellant shows that, on his father's side, his uncle died in an insane asylum, that his aunt had been an inmate off and on of an insane asylum for a good many years, that his grandfather was insane; that his grandmother, discovering this unfortunate fact after the birth of her third child, ceased to cohabit with her husband, and there were no further children; and that appellant's own father has shown symptoms of insanity. On his mother's side, appellant's grandfather committed suicide while insane, his grandmother died insane, a first cousin of his mother committed suicide while insane, some uncles and aunts and other cousins were insane, and his own mother had been treated in the psychopathic ward of the city hospital of Louisville. There is no contradiction of this depressing history of appellant's family. A number of lay witnesses who testified for the appellant said that he was of unsound mind. On cross-examination they gave as the basis for their opinions the facts that the appellant walked in a peculiar manner, could not hold a connected conversation long, and did not associate with boys of his own age, but played with children from 6 to 8 years old. His peculiar gait no doubt was due to an abnormal condition of his spine, concerning which there seems to be no dispute in this evidence. Appellant also showed that about six months prior to the homicide he had some sort of a fit, the description of which in the evidence inclines us to believe

that it was an epileptic fit; but this is the only fit so far as this record shows that the boy ever had. He left school at the age of 16, having reached only the fifth grade, and was then in the retarded class. The physician who examined him and who testified for him, and his teachers, all say that he is of sound mind but that he is of retarded mentality, having only the mind of a boy 7 or 8 years of age, as demonstrated by his examination under the Binet test. On the other hand, the commonwealth's proof showed that the appellant had for a number of months previous to the homicide worked at different industrial plants in the city of Louisville, in some of which he had to perform tasks requiring some degree of concentration of mind and adaptability of purpose, that the last place in which he worked had determined to promote him to be an enameler of plumbing ware, but was deterred from doing so because he quit the job he had, as he did a few days prior to the homicide. The appellant testified and was on the stand for probably over an hour. His examination discloses no lack of ability to keep up a connected conversation. The physicians who examined him for the commonwealth said that he was of sound mind and that he had the mind of the average youth of his age, considering his surroundings, environment, education, and character of work.

Of course on this statement of the evidence it was for the jury to say whether or not, even though appellant had the mind of a boy 8 or 9 years of age, he yet had mind enough to know right from wrong and had sufficient will power to control his actions. Sloan v. Commonwealth, 211 Ky. 318, 277 S. W. 488. Whatever might have been our own personal views on this issue had we been sitting as jurors, the law vests the determination of it not in us but in the twelve laymen chosen from the vicinage as jurors, and, if there be substantial evidence to sustain their finding as there was in this case, such finding is binding and conclusive on the courts though there be substantial evidence to the contrary.

These are the only grounds relied on for a reversal in this case, and, as none of them are grounds in law for such a result, the judgment of the lower court must be and it is hereby affirmed.

Whole court sitting.