## Berry v. Commonwealth.

(Decided January 25, 1929.)

FOX & GORDON for appellant.

J. W. CAMMACK, Attorney General, and S. H. BROWN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Reversing.

On Sunday, September 4, 1927, Johnson Berry shot his divorced wife, Susie Berry, and from that shooting

she died a few hours thereafter. He was charged by indictment with murder, upon his trial he was found guilty, and his punishment fixed at death. The severity of this punishment is our apology for the length and elaboration of this opinion.

This is a noteworthy record. The order book entries are full, clear, and correct; both the commonwealth and the defendant were represented by skilled and careful counsel, who knew the case and noted every move, overlooking nothing, no matter how trivial; and the court watched the proceedings with a studious care. Defendant filed the following grounds for a new trial:

(a) Because the court erred in overruling the demurrer to the indictment against Johnson Berry.

(b) Because the court erred in overruling defendant's motion for continuance of this case till the next term of this court.

(c) Because the defendant did not receive a fair and impartial trial.

(d) Because the court erred in permitting the commonwealth to introduce illegal, irrelevant, and incompetent evidence.

(e) Because the court erred in refusing to admit legal, competent, and relevant evidence offered by the defendant.

(f) Because the verdict of the jury is clearly against both the law and the evidence.

(g) Because the verdict of the jury was reached as a result of prejudice and passion on its part.

(h) Because the court erred, at the conclusion of the evidence for the commonwealth in refusing, on motion of defendant, to give to the jury a peremptory instruction to find the defendant not guilty.

(i) Because the court erred in each instruction given to the jury, and the charge as a whole is erroneous.

(j) Because the court erred in not instructing the jury on the whole law of the case.

(k) Because the verdict is not sustained by the evidence.

(l) Because the verdict is palpably against the evidence.

(m) Because the court erred in permitting the commonwealth's attorney in his argument to the jury to use words and phrases that were improper, objectionable, and prejudicial in the extreme, which words and phrases

were used to and did inflame the passion and prejudice of the jury.

(n) Because the court erred in failing and refusing to discharge the jury and continue the case, on motions of the defendant.

As a preface to our discussion of these, we deem it advisable to make a statement of the facts disclosed by the record.

Johnson Berry and his victim, Susie Berry, were married about 16 or 17 years before the tragedy. They were white people of respectable families, and both had been reared in Hopkins county. They had lived in or around the city of Madisonville for several years. They had two children, a girl 10 or 12 years old and a boy about 8.

When Johnson Berry was a small boy, he was struck on the head by a stone that had been thrown by a boy with whom he was playing. This gave him considerable trouble then. In the language of a witness, ''He was down quite a while, 4 or 5 months. His head rose.'' Some sort of operation was performed on him then. A portion of his skull was removed and a silver plate was put in.

About 3 years prior to the killing, while the defendant was working in a coal mine, he received some injuries to his arm and shoulder. He was taken to a hospital at Chicago, where he was for some time. A portion of this injured bone (the humerus) was removed, and a portion of a bone taken from one of his legs was inserted in lieu thereof. The defendant recovered, but from then on was a very nervous person.

He and his wife had had some trouble, had separated, and an adjustment was made of their property rights. Later they became reconciled and resumed their marital relations, but trouble came again, and on November 16, 1926, Susie Berry sued the defendant for divorce.

On November 20, 1926, the defendant was adjudged a lunatic by the Hopkins county court and sent to the asylum at Hopkinsville. He was released about the 20th of December thereafter, having been in the asylum practically one month. He returned to Madisonville, where he met his wife on Main street in front of one of the principal stores of the town, and had a conversation with her. During that conversation he drew a knife and began cutting his throat in an attempt to take his own life, but par-

ties near them interfered and prevented his accomplishment of his purpose. He was carried to a hospital in Madisonville, where his wound was treated until it had healed sufficiently that he could be moved. Thereupon he was taken to the asylum again, and remained there until some time in April or May, 1927.

In February, 1927, Susie Berry was granted a divorce from defendant, and given the care and custody of the two children.

When Johnson Berry was released from the asylum in the spring of 1927, he first went to Illinois, and later to Evansville, Ind., where he made his home until the time of this killing. While he was in Evansville, he married another woman with whom he lived in that city.

Between May, 1927, and September, 1927, the defendant made several trips to Madisonville to see his children and also to see his former wife. He says that he loved his children and also loved his former wife, and it is apparent from this record that she loved him, and that these meetings with his wife were more than casual visits, as the evidence indicates their relations on those visits were improper, in view of the fact that they had been divorced.

The defendant seems to have been very much attached to his children. He was nervous, and continuously talking about his children and wanting to see them. According to witnesses, "He was always crying and taking on about them."

It was also shown that even before he was adjudged a lunatic he had made an attempt to cut his throat, but parties present interfered, and that time he was not even partially successful.

He came to Madisonville from Evansville some 2 or 3 weeks before the killing and remained until this homicide at Madisonville and at Earlington, which is only four miles away, staying with his brothers and sisters.

Witnesses who saw him then described his nervous condition and the way he would talk about his children, and said, "He cried and took on about them." The evidence shows that during this time he met and talked to Susie Berry several times, and indicates that they did more than talk. The overwhelming weight of the evidence is that the defendant never uttered one word of ill feeling or unkindness against Susie Berry. However, there is some evidence of threats he had made which will

be discussed later. It appears that he brought with him to Madisonville a shotgun, which he used in hunting, and for some time prior to this killing this gun had been at his brother Roy's house at Madisonville.

Several days before the killing he took the gun to the house of his brother at Earlington and kept it there. On Saturday night before the killing, he returned to Madisonville to the home of his brother Roy. Roy Berry and his wife described the nervous condition of the defendant on that Saturday night, and testified that "He cried and took on about his children, that he was up and down all night and smoked a number of cigarettes."

On the day of the killing he left their home early in the morning and went to Earlington, where he visited another of his brothers, but about the middle of the day he came back to Madisonville and brought with him this shotgun. He had taken it apart and had the breech of it in a suitcase and had the barrel part of it strapped to the outside of the suitcase.

He went to the home of his brother Lilburn Berry, where he put this gun together and stood it up behind the door, remarking that he was going to take the gun to his brother Roy's who lived in another part of Madisonville. The defendant was doing some writing, and, at the request of his sister or his sister-in-law, he went out on the front porch, where he continued his writing. As the ladies desired to take a bath, they pulled the screen door to, and fastened or latched it, and then closed the door. Presently the defendant came to the screen door and shook it and asked the ladies to unlatch it, and let him in, stating that Susie Berry was passing, and he did not want her to see him. It was shown that he had often made such requests before when she was passing, and nothing was thought of it. They opened the door and then went into another part of the house.

The defendant came in, got the gun, and ran out the front door. Susie Berry was at that time passing the house on the sidewalk a short distance away. Without saying a word, the defendant ran after her. Susie noticed him coming, and had partially turned toward him. He fired, and that shot took effect in the biceps muscle of her right arm. She said, "Oh, my God." She staggered and fell toward him. She was apparently trying to pull herself up by the fence when he shot her again. This shot

took effect in her left lower jaw and in her throat. From this wound she died a few hours later.

The defendant then reloaded the gun and walked to the corner of the house, where he fired it apparently in an effort to shoot himself. He then walked a short distance into the garden, behind the house, and there shot himself in the back or side of the back of his head, making a very severe wound, which tore away a part of his skull, so that his brain was left exposed, a portion of his brain was carried away by the shot, and other brain matter escaped from the wound.

The first man that got to him was a Mr. Watson, and when Mr. Watson came up the defendant asked him who he was and he told him. Then he asked Watson to get him out of the sun and complained of his head hurting him, and said something about wanting to die. Watson had taken the defendant's gun from him when he first came up. A Mr. Jones came up about that time, and the defendant tried to get his gun again in order to shoot Jones. Defendant was carried to a hospital, where he recovered.

We shall now discuss his grounds for a new trial, but in our discussion of them we shall not do so in the order in which he has made them, but shall regroup them, because many of them amount to the same thing.

Ground (a). The Indictment. This ground is directed to the indictment, which the defendant alleged was insufficient, but we have examined it and are unable to find fault in it, and apparently he was not able to find fault in it either, because he has not discussed it in his brief, so that disposes of ground (a).

Ground (b). Motion for Continuance. The defendant made a motion for a continuance on account of the absence of Lilburn Berry and Elbert Jernigan, and accompanied his motion by an affidavit, wherein he set out what the evidence of these witnesses would be. The commonwealth declined to admit that Jernigan would make the statements set out in defendant's affidavit, but agreed to admit, subject to relevancy and competency, the statements of his affidavit as to what would be the evidence of Lilburn Berry.

The court thereupon announced that he would secure the personal attendance of the witness Elbert Jernigan who was shown by the affidavit to be in Hopkins county, and the defendant thereupon announced ready for trial.

Jernigan was not introduced as a witness, and this record does not show whether or not the court secured his attendance, but probably he did, because the defendant makes no complaint of it in his brief, and errors not discussed in brief will be treated as waived. Troendle v. Wells, 216 Ky. 819, 288 S. W. 749; Thompson v. London Assurance Corp., 214 Ky. 1, 282, S. W. 553. The court allowed the defendant to read from his affidavit as the evidence of Lilburn Berry the whole thereof, except this, which was stricken:

> "That during the past 2 years prior to the shooting of Susie Berry he had heard Johnson Berry make the statement on several occasions that there were times when his mind was a blank and he did not know anything."

This statement, if made by the defendant to Lilburn Berry, was a self-serving declaration of the defendant, and hence inadmissible. See Cornett v. Com., 156 Ky. 795, 162 S. W. 112; Martin v. Com., 178 Ky. 540, 199 S. W. 603; Keith v. Com., 195 Ky. 635, 243 S. W. 293.

This disposes of ground (b).

Ground (c) is too general to be considered.

In specifying errors in a motion for a new trial, great particularity is not required. All that is necessary is to use such plain and intelligible language in the grounds for a new trial as points out or shows to the court, with reasonable and ordinary certainty, the particular errors complained of, so as to enable the court, by the exercise of proper attention, to understand what errors are meant, and, when a ground for a new trial is so general that it does not do so, then it will be disregarded. See Am. Credit-Indemnity Co. v. Nat. Clothing Co. (Ky.) 122 S. W. 840.

Ground (i). The Instructions. The accused is complaining of the instructions given, but we have carefully examined them, and have compared them with the instructions given in the case of Portwood v. Com., 104 Ky. 496, 47 S. W. 339, 20 Ky. Law Rep. 680, and we find that they are identically the same as those instructions, excepting the names, dates, counties, etc. It is true that these instructions differ from those prepared by this court in the case of Abbott v. Com., 107 Ky. 624, 55 S. W. 196, 21 Ky. Law Rep. 1372, and, because the Abbott opinion was written after the Portwood opinion, it might

be argued that the court did not entirely approve of the instructions contained in the Portwood opinion, but an answer to that is that in a subsequent case of McCarthy v. Com., 114 Ky. 620, 71 S. W. 656, 24 Ky. Law Rep. 1427, the instructions were again identical with those in the Portwood case, and that judgment was affirmed. This is a question we have often had before us. See Brown v. Com., 77 Ky. (14 Bush) 400; Ball v. Com., 81 Ky. 662; Graham v. Com., 55 Ky. (16 B. Mon.) 587; Scott v. Com., 61 Ky. (4 Metc.) 227, 83 Am. Dec. 461; Smith v. Com., 62 Ky. (1 Duv.) 224; Kriel v. Com., 68 Ky. (5 Bush) 362; Cotrell v. Com., 17 S. W. 149, 13 Ky. Law Rep. 305; Smith v. Com., 17 S. W. 868, 13 Ky. Law Rep. 612; Phelps v. Com., 32 S. W. 470, 17 Ky. Law Rep. 706; Hays v. Com., 33 S. W. 1104, 17 Ky. Law Rep. 1147; Moore v. Com., 92 Ky. 630, 18 S. W. 833, 13 Ky. Law Rep. 738; Jolly v. Com., 110 Ky. 190, 61 S. W. 49, 22 Ky. Law Rep. 1622, 96 Am. St. Rep. 429; Wright v. Com., 72 S. W. 340, 24 Ky. Law Rep. 1838; Mathley v. Com., 120 Ky. 389, 86 S. W. 988, 27 Ky. Law Rep. 785.

In the case of Mathley v. Com., supra, we said that certain instructions must now be considered as affording, when applicable, the correct rule, but in no opinion that we have been able to find or to which our attention has been called has the instruction given in the Portwood case been condemned, though we have since the writing of the Portwood opinion approved other and different instructions. For example, see Thompson v. Com., 155 Ky. 333, 159 S. W. 829, and Hall v. Com., 155 Ky. 541, 159 S. W. 1155. The defendant has not in his brief set out any other and further instructions that he contends should be given, and we can conceive of none, as the instructions given covered the whole law of the case. This disposes of grounds (i) and (j).

The Ruling on Evidence. The defendant took the stand and testified in his own behalf, and during the course of his cross-examination these nine questions were asked him:

"1. Didn't you beat up your wife when you were out there?

"2. Wasn't it because of the fact that you had beat her up?

"3. Didn't she have you arrested for beating her up?

> "4. Were you arrested for beating her up?
> "5. Was that when you shot at her?
> "6. Did you ever shoot at her?
> "7. Were you arrested for shooting at her?
> "8. You wasn't arrested for striking your wife or anything of that kind?
> "9. You didn't strike her out there neither while you were living on the Earlington Pike?"

His answer to each of these questions was, "No, sir." He then introduced his brother Roy Berry as a witness in his behalf, and during the examination of Roy he was asked these three questions:

> "1. You say when he was sent to the asylum you tried to keep them from sending him?
> "2. Wasn't he drunk then?
> "3. Wasn't that what you all informed the county attorney and tried to keep him from going?"

He answered all of them, "No, sir."

There is not in the record anything to indicate the commonwealth had any reason to believe that any of these questions would have been answered in the affirmative, unless it be the question asked the defendant about striking his wife. There were some things proven that would indicate that the commonwealth might have expected an affirmative answer there.

It is urged that the defendant did not object to all of this, but to the first ones only, and we have written that, when a line of interrogation is begun and the defendant objects, his objection is overruled and he excepts, it is not necessary for him to continue to object after each question along the same line that is asked of the same or any other witness. See Brown's Adm'r v. Wilson, 222 Ky. 454, 1 S. W. (2d) 767, and cases there cited. Thus it appears that, if the asking of these questions was error, the defendant did not waive the error by failing to object to all of them. He objected to that line of interrogation, and his objection, once made, applies to all questions along that line. However, we are not prepared to say this was error.

We know that the defendant killed his former wife. He does not deny it. He says he knows nothing about it, and attempts to excuse his act by a plea of insanity. He contends he loved her and did not wish to kill her, and that he had always been kind to her, and never had

wished her any harm, and, in view of the defense he is making, we are not prepared to say that the court erred in allowing the commonwealth to ask these questions. Where a defense such as this is made, the evidence necessarily takes a very wide range, and we feel that the matters asked about were within the scope of proper inquiry.

To sustain his contention the defendant has cited the case of Linde v. Com., 208 Ky. 98, 270 S. W. 451, wherein witnesses who had been introduced to prove the good character and reputation of the defendant were asked if they had heard the defendant's neighbors and acquaintances talk about his being indicted for false swearing. In that case the witnesses said, "No." We said that was error, and that error continued through the case, and the commonwealth's attorney in his argument to the jury based a portion of his argument upon that error.

We reversed that judgment, but we cannot say this is a parallel case. In the Linde case, the commonwealth's attorney asked the witnesses if they had not heard of certain things, the witness said, "No," but the nature of the question and the witness' answer were such as to leave the impression yet before the jury that such things might have been true and merely the witness had not heard of them, whereas in this case, when the witness said, "No," which absolutely disproved the existence or the happening of the things mentioned in the question, unless some proof was brought forward to show that those things had actually occurred, and no such evidence being offered, then the things contained in these questions are absolutely disproved.

Moreover, an examination of the Linde case will show that it was not reversed because these questions were asked. We did not approve the questions, but we particularly stated that it was not necessary that we should determine whether or not they constituted reversible error, as the judgment had to be reversed for another reason. This disposes of the alleged error contained in these questions asked the defendant and his brother.

The commonwealth asked the defendant while he was on the stand about some things that happened while he was living on Virginia street in Evansville, Ind., and among other questions, asked these:

"About three weeks before you killed your former wife, I will get you to state if you invited Harve Berry up to your house on Virginia street

and while you all were in there you got to talking about different things, and you told him there had been a girl staying there with you and your wife and that you wanted to get rid of her, but you couldn't fire her for she would give you away for bootlegging, and you and your wife made it up that you would grab your wife and back her against the wall and take a razor and act like you were going to kill her and that you did do that very thing with your wife and that the girl left because you played crazy —did that happen?

"I will ask you if Berry didn't after that time state to you, 'Johnson, they are going to catch you over here for this bootlegging,' and you said that wouldn't make any difference you would just go up to the asylum and stay for a while and come back?"

The defendant in answer to these questions said, "No, sir."

The commonwealth then introduced, not Harve Berry, but Hardy Boshears, a half-brother of deceased, and asked Boshears these questions:

"I will get you to state if some three weeks before the killing of Sue Berry by Johnson Berry, if you were in the city of Evansville where Johnson Berry was living with his second wife, and if he invited you to go to his home and if you went on Virginia street and while you were in there in conversation with him, he told you this or in substance this: that there was a girl that had been working with them they wanted to get rid of and that he was afraid to fire her for fear she would turn him up for selling whisky and that he and his present wife planned that he should play insane and that he grabbed his wife and backed her against the wall and he took a razor and pretended like he was going to kill her and in that way you got rid of the girl?

"And after that, did you say this or in substance this: 'Johnson, they will get you, or catch you, in selling whisky,' and he said to you, 'that don't make any difference; I have just come out of the asylum and they can't get me.' "

To each of the qestions Boshears answered, "Yes, sir."

The defendant now contends that these questions asked the accused and these questions asked Boshears were highly prejudicial, and that the court should have admonished the jury of the purpose for which they were introduced, etc., but in the recent case of Oney v. Com., 225 Ky. 590, 9 S. W. (2d) 723, we had a similar question before us, and this is taken from that opinion:

"After the defendant had closed his evidence, and during the introduction of the commonwealth's evidence in rebuttal, the commonwealth was permitted, over Oney's objection, to recall Oney and to ask him about whether or not he said certain things, on his way to Salyersville after his arrest. Evidently the commonwealth thought it necessary to ask these questions in order to lay the grounds for the contradiction of Oney and thereby to impeach his testimony. Oney, in answer to these questions, said that he was so excited and terrified at the time he did not remember what he said. Thereupon the commonwealth introduced a witness who testified that Oney did make the statements he had been asked about, and the judge admonished the jury they should consider that evidence only for the purpose of contradicting Oney, and that the jury would be the judge of whether or not it did contradict him. Admissions made by a defendant against his interest are competent as substantive evidence against him, and it was not necessary for the commonwealth to ask Oney about making those statements before introducing proof to show he did make them, so there is nothing in this contention. The commonwealth was entitled to prove these statements, not as contradictions of Oney's evidence, but as substantive evidence for the commonwealth."

When a defendant is testifying for himself the commonwealth does not have to ask him if he made certain statements against his interest and then call witnesses to prove he did make them, for the purpose of contradicting the defendant, but statements made by a defendant against his interest are direct substantive evidence, and can be proven in chief without laying any grounds therefor. This disposes of these objections.

The accused testified there were times when he did not know anything and could not remember what had

happened. The evidence shows that he attempted to kill himself in Madisonville on the evening of December 23, 1926, by cutting his throat; that, after being treated in the hospital at Madisonville for several days, he was, on December 29, taken to the asylum for the insane in Hopkinsville, and he testified that he did not know anything or remember anything about what happened in Madisonville until he came to himself in Hopkinsville, and, while he was on the stand, the commonwealth asked him if he did not while he was in the asylum write his wife, the particular questions and answers being these:

"While you were in the hospital didn't you write her a letter?

"I might have, I don't know whether I did or not.

"I will ask you if you didn't write her a letter in which you said this: 'Just think if you had went with me on the night of the 23rd I would not have cut my throat or had to go back to this awful place. You know that I knew what I was doing.' Did you write her that?

"I don't know; I don't remember.

"Didn't you write her that on the 29th day of December, 1926?

"I don't know whether I did or not, I won't say."

The defendant's counsel say that, at the time these questions were asked and answered, the attorneys for the commonwealth had some papers which made them believe, and they alleged also made the jury believe, that they had such a letter, hence they did not object to this evidence, and urge that they had no right at that time to ask to see that letter, and that, as the commonwealth did not at any time produce this letter, this was error, and that the impression was left on the minds of the jury that the defendant did write such a letter, but this was not erroneous.

The defendant's counsel had at that time a right to ask to see the letter, but, when the defendant said he did not know whether he wrote such a letter or not, and it was never introduced, there was no evidence that such a letter existed and the defendant's counsel could, and, knowing their skill and ability, we are very certain that

they did, in their argument to the jury, argue that no such letter ever existed.

During the course of the interrogation of the witness Richard Williams, the commonwealth asked Williams: ''Did you ever have any conversation with him (the defendant) in which he threatened to kill his wife?'' The defendant objected to the question, and his objection was sustained. No avowal was made to show what the answer of the witness would have been, but, as the defendant's evidence is filled with fervid declarations of his love for his wife and his good will toward her, it was in order for the commonwealth to undertake to disprove that, and, if the commonwealth could disprove it by showing he had threatened to kill her, that was very material; but the commonwealth should have done so in chief, and we suppose that is the reason that the court sustained an objection to it. There is nothing to show just why the court sustained this objection, but it was objectionable because it did not come at the proper time.

While the defendant was on the stand, and in the course of his cross-examination, he was asked if he knew Mattie Graham. He said he did. He was then asked this question:

''A week or ten days before the killing, I will get you to state if you didn't have a conversation with her and you told her you were looking for your former wife, Sue Berry, and Mattie Graham told you she wasn't there or had gone or in substance that, and you told her you were coming over here and make it hot for the whole damned family?''

The objection to the question was overruled, he excepted, and for his answer said, ''No, sir.'' He is now arguing that this question was improper and prejudicial to him because it did not fix the place, the time, or who was present. The commonwealth later called Mattie Graham, and this is taken from her testimony:

''Did Sue Berry work over at Earlington shortly before she was killed?
''Yes, sir.
''How long had she been away from Earlington?
''I would think about two weeks.
''Did you and her room together over there?

"Yes, sir.

"While you were living in Evansville did Johnson Berry come there seeking her?

"Yes, sir.

"I will ask you this question: If he came over there seeking her and at one time you told him she was gone and he said this to you, or in substance this: That he was coming over here and make it hot for the whole damn bunch? (Defendant objects; objection overruled; defendant excepts.)

"Yes, sir; he did."

This was not error. The commonwealth was proceeding as though it were trying to impeach the defendant, and that it had to pursue this method in order to do so. The commonwealth was mistaken about the nature of this evidence, for this evidence, like the evidence discussed above, could have been used as direct substantive evidence against the defendant; could have been introduced in chief before he was on the stand; and could have been introduced whether he ever took the stand or not, and that is the way it should have been done, except, instead of asking these questions in this way, thereby putting the language into the mouths of these witnesses, the commonwealth should have asked the witnesses if they had such conversations and what the defendant said in those conversations.

The commonwealth introduced in rebuttal 19 witnesses who were not experts in any sense of the word, but just ordinary citizens, neighbors, and acquaintances of defendant, who testfied to their acquaintance with him, who related in their testimony what their opportunities had been for observing him, and for forming the opinions which they had, and who testified that he was sane, and the defendant now insists that none of this should have been admitted, but in the case of Brown v. Com., 14 Bush (77 Ky.) 398, we disposed of a similar contention, adversely to the contention of the defendant. We feel that the authority just cited is a conclusive answer to his objection to this evidence.

In the conduct of this trial and in its evidence in chief, the commonwealth introduced evidence to show that Susie Berry was killed, who killed her, and how it was done; then the commonwealth rested. Thereupon the defendant took the stand in his own behalf, and, after

he had testified, he called a number of witnesses, including a number of laymen, and he asked them what their opportunities had been for knowing the defendant, and how long they had known him, etc., and then asked their opinion about whether or not he was sane, and, if we may use a homely expression, it would seem that what was sauce for the goose should be sauce for the gander.

We hardly see how he can pursue a certain line of interrogation, and, after he has rested, can then object when the commonwealth pursues the same line and offers similar evidence from similar witnesses. We think, under the authority just cited, however, that this evidence was properly admitted.

This disposes of the alleged errors in the admission of evidence against him, of which the defendant is complaining; but he says that he was not allowed to introduce competent evidence which he offered, and this offered evidence which was rejected was this: They called several witnesses who testified to their knowledge of and acquaintance with him, and by whom he sought to prove that during the year prior to the killing they had heard him, on several occasions, make the statement that there were times he did not know what he was doing, and did not remember what had occurred. The court properly refused to permit this evidence to be introduced, because what the defendant was attempting to prove by these witnesses were self-serving declarations that he had made himself. Of course, when he was on the stand, he could testify that there were times when his memory failed him and when he did not know what he was doing, and he did so testify, but he is not allowed to testify more than once, and, if he should go on the stand and testify that black is white, it would not make the jury believe it, if he should thereafter be permitted to prove by 40 different witnesses that he had told them that black is white. That might induce the jury to believe he thought black was white, but it still would not make the jury think black was white. After all, it goes back to his statement: Did he tell the truth when he said he did not know what he was doing and that is for the jury to determine. If he falsified, it is just as false after he repeated it a hundred times as it was after he told it once.

The defendant introduced the clerk of the Hopkins circuit court and offered to have her read to the jury the proceedings had in which defendant was adjudged a lun-

atic, and confined in the asylum. The court refused to permit this record to be read, but permitted her to read the judgment adjudging him insane, and the defendant then read into the record as an avowal the whole of that proceeding, and now insists that the court erred in not permitting the whole of it to be read to the jury. We cannot believe that was error. All the defendant was entitled to have the jury told was that he had been adjudged a lunatic.

It was not proper for this jury to retry the issue in that proceeding; hence it was not proper for it to hear the evidence in that proceeding. It was entitled to know that the defendant was adjudged a lunatic, but not entitled to know what the evidence was upon which he was so adjudged.

The defendant introduced Dr. I. J. Townes, a physician who had practiced for nearly 40 years, and propounded to him a long hypothetical question in which he asked the doctor to say whether or not the defendant was insane. The doctor said he did not think he was an expert, and did not feel that he was competent to answer that question. The commonwealth objected to this evidence, and the court sustained that objection. The defendant then avowed that, if this witness were permitted to answer, he would state in his opinion the defendant did not have sufficient will power to govern his actions. The defendant now says that the exclusion of the doctor's evidence was error. Whether or not the doctor had sufficient experience with insane persons to be able to answer such a question is a matter known only to him, and, as he said that he had not, we cannot see that the exclusion of his evidence was error. The defendant did not offer to ask the doctor about this man's sanity except in this way. He did not ask him if he knew the defendant or how long he had known him, or what examination he had made of him, so that the doctor might testify to such facts as he had learned in that way, if there were any such, or what opinion the doctor had formed therefrom, but confined his examination exclusively to this hypothetical question, and, as the doctor said he did not know, the court properly excluded his answer.

This is not like the cases of Montgomery v. Com., 88 Ky. 509, 11 S. W. 475, 11 Ky. Law Rep. 40, and Abbott v. Com., 107 Ky. 624, 55 S. W. 196, 21 Ky. Law Rep. 1372, where the doctors did think they had an opinion about which they offered to testify; but here is a man who says

he is unable to answer this hypothetical question, and, so far as we know from the record, he never saw the defendant before, had made no examination of him, and hence, could have no opinion about the matter except that formed from what he was told in this hypothetical question. This disposes of grounds (d) and (e).

The Sufficiency of the Evidence. The killing of Susie Berry by the accused being established, he must suffer the punishment for his act, unless he was insane at the time, and, to establish his insanity, he called as witnesses two of his sisters, two of his brothers, two of his sisters-in-law, an aunt, a second cousin, and the wife of a cousin, who testified that he was insane in their judgment. Six of his neighbors testified to acts and peculiarities of the accused upon which counsel for accused base their argument that he was insane.·

He introduced one physician who had formerly been for 6 years superintendent of the hospital for the insane at Hopkinsville, who testified that the accused was insane, and, in answer to a hypothetical question, said he was insane.

Another doctor who examined the defendant in November, 1926, when he was sent to the hospital, testified defendant was then insane.

To meet this, the commonwealth introduced the physician at the asylum, under whose care and attention the defendant was from November, 1926, until his discharge about December 15, 1926, and under whose care and attention he was from the time of his return on December 29, 1926, until his discharge in April, 1927, and he testified that the accused was sane, and gave his reasons for so regarding him, and said that he had then quizzed the accused from every possible angle.

The commonwealth introduced the mother, three sisters, and a nephew of the deceased, and they testified he was sane, also 15 neighbors, friends, acquaintances, tradespeople, and fellow workmen, who testified that he was sane. Of course, all these lay witnesses testified in detail about what their opportunities had been for learning the things about which they testified.

Thus we have in the evidence an irreconcilable conflict between the two sets of witnesses. It was for the jury to say which set should be believed. They saw them; heard them testify, knew their interests in the matter, and saw the defendant and heard him testify, and it can-

not reasonably be said that this verdict is flagrantly against the evidence; that it was the result of prejudice and passion on the part of the jury; that it is not sustained by the evidence; that it is palpably against the evidence; or that the court erred in refusing to give the jury a peremptory instruction to find the defendant not guilty.

Of course, if the jury had received only the testimony of the witnesses introduced on his behalf, this verdict would be so; having also received and evidently believed the testimony of those witnesses who testified for the commonwealth, this verdict is abundantly sustained by the evidence, and we have often written that a case will not be reversed because the jury believed one set of witnesses rather than another. Blanks v. Com., 223 Ky. 484, 3 S. W. (2d) 1105. This defendant was tried by a jury of the vicinage, perhaps members of the jury knew him, and, in all probability, many of them knew some, and some of them knew many, of the witnesses, some of the life history of the defendant, and we cannot disturb their verdict. This disposes of grounds (f), (g), (h), (k), and (l).

Grounds (m) and (n). Improper Argument of Commonwealth's Attorney.

The bill of exceptions in this case shows that the commonwealth's attorney in his closing argument to the jury said:

(x) "About two years ago a crime was committed in this county and two juries did their duty and there has not been a crime of that kind committed in the county since."

(y) "Send him to the penitentiary (referring to the defendant, Johnson Berry) and in a few years some soft-hearted Governor will pardon him and turn him loose on society to kill somebody else."

(z) "The welfare of the county is in your hands as it was in the hands of a jury two years ago."

On the day the bill of exceptions herein was signed by the judge, and filed as a part of the record by order of court, there was also filed by order of the court an unsworn statement signed by the commonwealth's attorney, wherein he denied making the statement which we have referred to as statement "Y," and also similar statement signed by the county attorney wherein he says he was

present at and assisted in the trial, and heard the argument, and that no such statement was made. No effort was made to procure a bystander's bill of exceptions, the court certifies such a statement was made, and, in such a state of affairs, we must go by the bill of exceptions signed by the judge.

We have often announced our rule in this regard and in Hopkins v. Com., 210 Ky. 378, 275 S. W. 381, we gave our reason for its adoption.

We have marked these statements (x), (y), and (z). We shall consider (x) and (z) together. These were undoubtedly statements referring to a rape case which had shortly before shocked the people of Hopkins county. As we have already said, this jury came from that county; and we are sure that there was not a member on the jury that did not know to what counsel was referring. This crime has now become a part of the judicial history of this country, and reports of it may be found in the case of Bard v. Com., 217 Ky. 479, 290 S. W. 337; Fleming v. Com., 217 Ky. 485, 290 S. W. 339, and Bard & Fleming v. Chilton (C. C. A.) 20 F. (2d) 906; Id., 275 U. S. 565, 48 S. Ct. 122, 72 L. Ed. ——. In the case of Jackson v. Com., 100 Ky. 239, 38 S. W. 422, 1091, 18 Ky. Law Rep. 795, 66 Am. St. Rep. 336, this court affirmed a judgment, although there was in the record an exception to the refusal of the court to stop the argument and to discharge the jury because the counsel for the commonwealth had referred to the Webster-Parkman case and the Durant case. The right of counsel in argument to embellish their arguments with illustrations is not governed by any fixed rule, and it has never been held to be reversible error for counsel to comment on matters of general knowledge, which all persons may be presumed to know, and which statements are merely made by way of illustration. Matters of common and general public information of known and settled history may properly be referred to and commented upon by way of argument and illustration. The theory upon which such argument is permitted is that the jury is supposed to be composed of men of ordinary intelligence, and the remark of the prosecuting attorney in calling to their attention that which they already know cannot improperly influence them in the finding of their verdict. In addition to the Jackson case, supra, we have another case from this state, Alder v. Com., 215 Ky. 613, 286 S. W. 696, wherein

we declined to reverse a judgment, although the attorney for the commonwealth in his closing argument had compared the murder in that case to the assassinations of Garfield, Lincoln, and McKinley. See, also, Truax v. Com., 149 Ky. 699, 149 S. W. 1033. Similar cases can be found in other states. For example, Northington v. State, 82 Tenn. (14 Lea) 424; Turner v. State, 89 Tenn. 547, 15 S. W. 838; Todd v. State (Tex. Cr. App.) 44 S. W. 1096. We feel that this reference by the commonwealth's attorney to the rape case that is cited above was within the scope of legitimate argument. That disposes of (x) and (z).

The statement (y) has given us more difficulty. In the case of Postell v. Com., 174 Ky. 272, 192 S. W. 39, this court reversed a judgment because, while the jury was considering the case, it came into the courtroom and asked the court if a prisoner under life sentence was subject at any time to a parole from the board of pardon commissioners. The court gave an affirmative answer to the question. The jury retired to its room, and thereafter brought in a death verdict. In the case of Lawler v. Com., 182 Ky. 185, 206 S. W. 306, the complaint was that the commonwealth's attorney had been guilty of misconduct in stating to the jury on their direct examination that "one convicted of a life sentence was under the law subject to be paroled after 8 years' service in prison." The jury brought in a verdict of death in that case, and, in considering the question, we held the statement of the commonwealth's attorney was improper, and the court should not have permitted it, but said we did not regard it so prejudicial as was the imparting of similar information to the jury by the judge in the Postell case. We declined to reverse the Lawler case, however, because we felt this was a matter that occurred in the impaneling of the jury, and that by section 281, Criminal Code, we were precluded from considering it.

In Bailey v. Com., 193 Ky. 687, 237 S. W. 415, the commonwealth's attorney said to the jury: "This defendant has been shown by the evidence to be guilty of the crime with which he is charged, and a verdict of yours which fails to send him to the electric chair, in my judgment, will not be the kind of a verdict that should be rendered under the facts in this case." The court observed there that this statement was primarily directed toward the punishment which the jury should inflict, and, as the

jury had fixed the punishment at life imprisonment, the court said it was unable to see wherein Bailey could complain, and we said that the prosecuting attorney was not required to withhold from the jury his views touching the extent of punishment, which he, in good faith, believes the enormity of the crime merits.

In Chappell v. Com., 200 Ky. 429, 255 S. W. 90, Chappell had been given a 20 year sentence under section 1160, Kentucky Statutes. The commonwealth's attorney had said to the jury: "The penalty is from 5 to 20 years. The limit is not enough. Under our present system of coddling criminals he will get out in half the time you give him." We said this language was improper, but refrained from saying whether or not its use was reversible error, because the case had to be reversed for another reason.

In Bolin v. Com., 206 Ky. 608, 268 S. W. 306, wherein a death penalty had been inflicted, the commonwealth's attorney had said in his argument: "You cannot impose a punishment that amounts to anything by sending a man to the penitentiary for life; weak-kneed Governors and prison commissioners turn them out on the community and the only punishment that will instill fear in the hearts of men who shoot women through windows in their homes is death." The court there discussed the Chappell case, Postell case, Bailey case, and Lawler case, and said that perhaps the excerpts from the arguments in those cases were intended to apply to comments of the commonwealth's attorney as based on the facts and circumstances proven in the case, and did not attempt to justify references by the commonwealth's attorney in his argument to the consequences flowing from the due administration of other departments of the state and which would possibly follow the infliction of a different punishment, and that it was for that reason that the practice was condemned in the Postell and Chappell cases; but the court continued, and said it was not authorized to reverse a judgment of conviction, unless the error complained of was so prejudicial to the rights of the defendant as to authorize it. The court affirmed that judgment. A remark very similar to that one was made several times by the commonwealth's attorney in the case of Hall v. Com., 207 Ky. 718, 270 S. W. 5; we affirmed that judgment, and that was a death sentence. We said: "We regard the Bolin case as conclusive of this alleged error urged by appellant."

In Seymour v. Com., 220 Ky. 348, 295 S. W. 142, we condemned a similar argument, but we were unable to reverse that judgment because the argument had not been relied on in the motion for a new trial. In that case we said:

"We are surprised that the commonwealth's attorney indulged in this argument, since in a long line of cases we have unhesitatingly condemned like arguments. Estepp v. Commonwealth, 185 Ky. 156, 214 S. W. 891; Chappell v. Commonwealth, 200 Ky. 429, 255 S. W. 90; Bolin v. Commonwealth, 206 Ky. 608, 268 S. W. 306; Hall v. Commonwealth, 207 Ky. 718, 270 S. W. 7, and the cases therein cited. We are equally as surprised that the trial court overruled the objection of the appellant's counsel to this argument. Nothing that we could here say could add anything to what we have said in the opinions cited in condemning arguments like the one in question. The very fact that we are called on so many times to discuss this question, as the number of these opinions show, induces the belief that many of the commonwealth's attorneys are not heeding as they should our ruling in this matter. We are loath to believe that such action on their part is encouraged because these arguments, although condemned, have under the particular facts in the cases involved been held by us not so prejudicial as to warrant a reversal. But the trial courts should not wait for this court to be finally confronted with a case where such an argument will be so prejudicial as to require a reversal, but should themselves discipline commonwealth's attorneys who will not abide by the rulings of this court in this matter."

We cannot imagine any case which could present any stronger grounds for holding such an argument prejudicial than this one. If the argument never rises to the dignity of a prejudicial error, it is hard to see why we should so consistently condemn it.

In the instant case, there was an abundance of proof establishing a diseased condition of the appellant's mind long before as well as at the time of the homicide. We are not unmindful of the quantity of proof to the contrary appearing in the record, and we admit that the question of appellant's sanity was rightly submitted to the jury. But how far can we say it was persuaded to

adopt the view and mete out the punishment it did by the fact that, even when adjudged insane and sent to an asylum for treatment and safe-keeping, appellant had on both occasions been turned loose so shortly after his confinement, only on the first occasion to attempt suicide, · followed by a recommitment to the asylum, and on the second occasion to commit the offense for which he is now being tried. Evidently a finding of insanity did not even tend to put this unfortunate man away so that he could not harm himself or others. Society tends instinctively to protect itself and, as an adjudication of insanity had not brought about that result, as regards the defendant, it is not hard to understand the potent effect of an argument addressed to this jury that confinement for life would probably not solve the problem any better, since, as argued, "some weak-kneed governor would soon turn him loose on society to kill somebody else."

Unfortunately, we have no separate institution in this state for the confinement of the criminal insane. Nor does our procedure permit the jury in a criminal trial, where the defense is insanity, to adjudge that the accused is insane and order his confinement to an institution for the criminal insane. As intelligent members of society, we know that juries often solve this dilemma by confining the accused in the penitentiary. And probably no injustice is really done by this procedure except possibly to the other inmates of the penitentiary. But, when a jury knows that the accused theretofore lawfully adjudged insane has not been thereby securely and finally put away, and that his release has been followed by violence to himself and others, it is easy to understand how it will be affected by any such argument as here was addressed to it. If that argument be improper, as is conceded, it certainly was prejudicial here, for it is extremely probable that its consideration persuaded the death sentence rather than life imprisonment. For this reason alone, the judgment is reversed, and a new trial ordered.

The whole court sitting. Judges Thomas and Willis dissent.