## Swopshire v. Commonwealth.

(Decided Dec. 16, 1932.)

594

LAURENCE GAMMON and MORRIS WEINTRAUB for appellant.

BAILEY P. WOOTTON, Attorney General, and FRANCIS M. BURKE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

John Swopshire was indicted for murder. His defense was insanity. The jury found him guilty, and fixed his punishment at death. He appeals.

The facts are these: Appellant, a negro about 32 years of age, lived with his mother, Mary Swopshire, at 410 Central avenue, Newport. During the evening of December 25, 1931, he was fighting and quarreling with his mother, and said in the presence of his sister, Bessie Swopshire, "This house is going to be blowed up before the night is over." Shortly before that time he had given his mother $20 out of his bonus check. His aunt, Gertrude Massie, who was present for a while, reprimanded him for his conduct, and told him that he had a good mother. Appellant said, "That is right, Aunt Gert, I ain't going to do nothing." Before that time he had said, "I am going to kill the God damn old crow, the God damn house is going to be burned tonight, and she don't know it." About an hour after she left he grabbed his mother around the throat and choked her. When the officers arrived, he had her head in his lap, and was bathing her head with towels. The officers took the mother to the hospital, and appellant accompanied them. She died before reaching the hospital. It was difficult to restrain appellant on the way to the hospital. When they arrived at the hospital, it was discovered that appellant had a cut on his head. When the nurse attempted to shave his head, appellant became very violent, and it took four men to hold him.

On the question of insanity, appellant's aunt and two sisters gave it as their opinion that appellant was not insane, and attributed his continued misconduct to meanness. On the other hand, one of the officers who accompanied appellant to the hospital testified that appellant appeared to be full of whisky or narcotics that night, and acted like he was crazy. In addition to this, some thirteen other witnesses who knew appellant, and had an opportunity to observe his conduct, testi-

fied to the same effect, and based their opinions on some one of the following grounds: Appellant was a hard drinker, and appeared to be full of whisky or dope. He claimed to hear people speaking through a light bulb. He went through motions with his hands "like he was making a pass at his mother and trying to hypnotize her." Oftentimes you could not understand what he said. Sometimes he would stand on the corner mumbling to himself in an unintelligible way, and use his arms and fists as if he were fighting somebody. He went down the street in his nightshirt. The neighbors could not take their children to his home because he would pester them. When the children played in the alley, he would take bottles and bricks and throw at them. About half the time he would pester the iceman so that he could not go in the house with a piece of ice. On one occasion he pitched the ice pick at his mother. On several occasions he struck his mother, and she had to have him arrested. He acted like he was crazy whether he was sober or drunk. He was frequently arrested and brought into police court for minor offenses. On one occasion his appearance and demeanor were such that Mr. Daly, the assistant city solicitor, suggested to the police judge and appellant's mother that appellant should not be tried on a police criminal charge, but should be tried for lunacy. After that he was tried for lunacy, but the jury found him sane. It was further shown that appellant's father had been adjudged insane, and was an inmate of the asylum.

In view of the conclusion of the court, we deem it unnecessary to determine whether the verdict of the jury is flagrantly against the evidence. Appellant's aunt and sisters attributed his conduct to pure meanness, while the other witnesses were of the opinion that appellant was insane. Even repeated acts of unexplained meanness and cruelty to one's own mother and others may be indicative of insanity, and it is not always possible for the ordinary layman to draw the line between what he construes as pure meanness and actual insanity. To say the least, the evidence as to appellant's continued drunkenness and erratic and abnormal conduct, coupled with the fact that his own father was insane, is very persuasive of his insanity at the time the offense was committed.

One of the grounds relied on for a new trial is the impropriety of a statement or question propounded by

the trial court. It appears that during the cross-examination of Annabel Kelly, appellant's sister, the court asked if appellant played the races. The witness answered in the affirmative, and added that her mother came over to her aunt's on Monday, and appellant picked out a horse for her mother and him, and they both won. The court then said, "He was not so crazy then." The views of the circuit judge are always of controlling influence with the jurors. They closely observe his demeanor and remarks, and are quick to take in anything that indicates his reaction to the case. As insanity is often interposed as a defense by persons of sound mind, there is a tendency among jurors to look upon such a defense as a mere subterfuge to escape the consequences of crime. The result is that one relying upon that defense finds it necessary to combat a pronounced prejudice in the minds of the jurors. However, crimes are committed by insane persons, and the defense of insanity is recognized by the law. In view of the prejudice against the defense, it is all the more important that the trial judge refrain from any remarks or questions reasonably calculated to discredit the defense in the eyes of the jurors. Whether the remark of the trial judge be regarded as a mere statement or a question, its effect was to make upon the minds of the jurors the impression that in his opinion appellant was not insane. As the evidence of insanity is very persuasive, and the action of the trial court may have turned the scales against appellant, and have induced the verdict of death, there is no escape from the conclusion that the error was prejudicial to appellant's substantial rights.

Some time prior to the homicide, appellant was tried for lunacy in the Campbell circuit court, and adjudged of sound mind. The record of that proceeding contained the report of two physicians appointed by the court to examine appellant stating that in their opinion he was insane, and giving the reasons for their conclusion. Appellant offered in evidence the record of that proceeding containing the petition for inquest, the order of court appointing two physicians to examine appellant, the report of the physicians, and the finding of the jury. On objection by the commonwealth, the record was excluded. Appellant insists that this was error. It is not perceived how the exclusion of the verdict of sanity was in any way prejudicial to appel-

lant's substantial rights. Indeed, appellant's principal contention is that he was entitled to have the report of the examining physicians go to the jury. It is true that in Smedley v. Commonwealth, 138 Ky. 1, 127 S. W. 485, 488, 129 S. W. 547, the court used rather broad language in saying that the exclusion by the court from the consideration of the jury "of the record containing the writ, judgment and other proceedings in the inquisition of lunacy," offered in evidence by appellant to show that he had properly been found and adjudged of unsound mind shortly before his trial, was error. But, after all, the question was whether the inquisition of lunacy was admissible, and the court did not have before it the admissibility of the report of the examining physicians.

However, the precise question was before the court in Berry v. Commonwealth, 227 Ky. 528, 13 S. W. (2d) 521, 529, and we there held that all that the defendant was entitled to show to the jury was the fact that he had been adjudged a lunatic. In reaching this conclusion we said:

> "It was not proper for this jury to retry the issue in that proceeding; hence it was not proper for it to hear the evidence in that proceeding. It was entitled to know that the defendant was adjudged a lunatic, but not entitled to know what the evidence was upon which he was so adjudged."
> Instruction No. 4 given by the court is as follows:
> "Although the jury may believe from the evidence beyond a reasonable doubt, that the defendant strangled and killed the deceased, Mary Swopshire, yet if they further believe from the evidence, that at the time of the killing the defendant was of unsound mind, then they should acquit him; and, before the defendant can be excused on the ground of insanity, the jury must believe from the evidence, that the defendant was at the time of the killing without sufficient reason to know what he was doing, or had not sufficient reason to know right from wrong, or that, as the result of mental unsoundness, he had not then sufficient will power to govern his actions, by reason of some insane impulse which he could not resist or control."

It is insisted that this instruction is erroneous in not using the words "believe from the preponderance of

the evidence'' instead of the words ''believe from the evidence.'' In reply to this contention, it is sufficient to say that the words actually employed are more favorable than those suggested, and that we have steadily refused to approve instructions requiring the jury to ''believe from the preponderance of the evidence,'' and the reason for the rule is all the stronger when applied to an instruction submitting a defense, and particularly the defense of insanity.

There is the further insistence that the court erred in not defining ''reasonable doubt.'' We need go no further than to say that it is so difficult to give a precise and intelligible definition of reasonable doubt that it has long been ruled in this state that it is better to instruct on that subject in the language of section 238, Criminal Code of Practice, and that a failure to define is not error. Mickey v. Commonwealth, 9 Bush, 593; Crump v. Commonwealth, 215 Ky. 827, 287 S. W. 23.

Other errors are relied on, but, as probably they will not occur on another trial, we deem it unnecessary to pass on them.

Judgment reversed, and cause remanded for a new trial consistent with this opinion.