## Harlan Central Coal Co. v. Gemmeno's Adm'r.

Feb. 15, 1944.

James Sampson and Edward G. Hill for appellant.
Astor Hogg and J. B. Carter for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Reversing.

The appeal is from a judgment in accord with a verdict against the mining company in whose employ Gemmeno was at the time he met his death. Appellee in his petition charged that deceased was killed by his head coming in contact with a rock which was hanging down from the top of the mine entry, he at the time using ordinary care for his safety.

Grounds laid in the pleading sufficiently charge a failure of appellant to furnish deceased with a reasonably safe place in which to work. Issues were joined and upon trial the jury returned a verdict in the sum of $5,000. The court overruled motion for new trial, it being supported by a number of grounds, but as we read briefs we find the chief argument to be that appellant was entitled to a directed verdict because the proof failed to show any negligence on its part, and further that under the proof it was patent that deceased met his death solely on account of his own negligence. It was stipulated that though eligible, appellant was not operating its mine under the provisions of our compensation statutes.

The accident occurred in the afternoon of an undisclosed day in September 1942, in the main entry of the mine, described as an underground tunnel through which all the mined coal and debris was carried to the outside. There is not a minute description of the physical situation, or the apparatus used in transporting the coal, and the method and manner of its use and operation. However, we gather that the method was to use the space from which coal had been mined as passageway through which transporting vehicles were conducted. This plan required specially constructed motors, of which it appears several types or models were made and sold for use in mines of this character. There is no contention that such as were in use in this mine (Goodman Motors) were not of the standard variety.

The mine had been in opeartion for more than seven years, and all tonnage and refuse from the mine had been carried from the various rooms through this entry where the accident occurred. At the time there were six or more room entries opening into the main, with six motor crews operating. It so happened that the point where the accident occurred was one of the low-

est ceiling in the entry. From a description of the motor later given, and other proof to be noted, it is apparent that at the point the motor had a clearance of not more than two inches. The motor in use was said to have been about 30 inches high, the rails and ties upon which it ran about 5 inches, and was operated by electric energy. The best we can make of it from the proof is that the power was transferred by means of a short trolley pole attached to some part of the motor; on this was a revolving reel which ran over (or under) the power wire. Just how the wire was maintained is not shown, but at low places this reel sometimes dragged or was pushed up against the roof of the mine.

Deceased was twenty-nine years of age, five feet nine inches in height, and weighed around 150 pounds. He was employed by appellant as an "experienced coupler," or brakeman; he had worked in other mines, and in appellant's mine for three weeks before the accident, though this was his first shift with Deal who was in charge of the motor. The accident occurred at some time after 2:30 p. m. Deal was running the motor; deceased was his coupler. The two were awaiting the loading of cars preparatory to hauling them out. They decided to go to the point 1000 feet distant where they had deposited their lunch boxes, the trip taking them through a portion of the main entry. There were no cars attached to the motor, and its lights were burning on both front and rear. As best we gather there was a deck or low place on one side of the motor which was the place where the motorman rode while operating. There was a stirrup and bumper on each end of the motor where the coupler or brakeman rode when there were no empty cars.

On the occasion the motorman was in his accustomed place, as was Gemmeno, his feet in the stirrup and he "was lying around the motor in front of the reel," his face turned toward the motorman. The motorman described this as being the "easiest way to ride" when the motor reached a low point in the entry. Deal said when the motor reached the low point the "reel barely touched the top." When asked "what hit the man to cause his death?" he said, "I don't know—he was back under—when I got to him under the low place, but he wasn't fastened when I got to him." He was asked, "How came you to stop?" and replied "I felt him catch over the top of the reel." The effect he said was to stop the motor the "same as the brake would have done."

Deal went to Gemmeno and "took hold of him; he was loose and free at that time." Deal went for aid, and returned in a few minutes and found him dead. He said he felt of his back and it "felt soft along about his neck bone there."

On cross-examination Deal said that when they started for their lunch and just before the accident happened, Gemmeno "was riding in the place made for the coupler to ride," lying around the bumper low enough to have cleared; that as he neared the dip he looked around to set the motor off, "and to see if he was low; he was lower than the motor." He said the lights on the motor threw "the light away from him and showed the top up." In answer to a direct question he replied, "Yes, he would have cleared if he had staid where he was when I looked around, and would not have hit the top." He further said when he reached deceased after his motor stopped he was lying around the bumper, "where he had been riding." It appears from his testimony on cross examination that at the time his reel was running on the wire, and not "scraping" the top.

As pertinent to matters discussed later, Deal said he had run motors "all over Kentucky;" had worked in mines in the vicinity and had been working as motorman in appellant's mine for six or seven years. In many of the mines where he had worked there were low ceilings which required small equipment of special type similar to that used in appellant's mine. He gave it as his opinion, based on his experience, that when the coupler or brakeman is on the motor and in the place provided for him to ride, he was safe from injury insofar as the "top is concerned." He stated that deceased appeared to be an experienced man.

The coroner who examined the body of deceased did not enlighten us a great deal as to just what his injuries were. He said his "chest and back was bruised red; there were some abrasions about the back of his neck and some on his face." There was slight effort to show that it was practical in the operation of a mine of this character to remove the top "so as to prevent a motor traveling in the mine to pass under the roof without dragging." The result was the testimony of one witness who said, "Yes, it would be practical to take it down in order that the coupler would have room to sit in the motor without being caught by the low top," a

conclusion without showing how it could be accomplished, or how much would have to be taken down to accommodate persons of various heights, or one who inadvertently arose from the place assigned to him. While much is said about the motor dragging, this because the reel was a part of the motor, there is nothing to show that the dragging had anything to do with the fatal accident. There, of course, is no claim of electric shock or burning, nor that Gemmeno fell or was knocked from the place he was riding, by the reel or any part of the motor.

Briefly summarized, proof by appellant (aside from that of Deal's on the point) shows without contradition that this mine was using this entry at all times; everything hauled out of the mine was through this entry with the same type of equipment in use at the time of the accident, designed and sold for use in "low coal." One experienced miner, who had worked for appellant for more than ten years, sometimes as motorman, and at times using the Goodman motor, said he was familiar with the entry and the particular low spot; said the top needed no taking down to allow the motor to go through. An experienced mining engineer said the main entry, cross entries and rooms were laid out, constructed and maintained by a mining engineer; that of necessity there were low places in the mine to follow the vein, but the fact that there were such places was no indication that operation was unsafe. He was familiar with the Goodman motor, which he had ridden in the mine, and said that there was ample room for the motor to pass through the low places. His opinion was that neither the motorman nor coupler was in any danger at this point while occupying the places provided for them to ride on the motor. The methods used were such as generally practised.

It was stipulated that two absent witnesses would testify to the same effect. Deal, who was no doubt a motorman of considerable experience in low vein mines, said it would be safer to take the top down, but "it is not practical." Since appellant was not operating under our Compensation law, it could not successfully interpose the defenses of (1) contributory negligence; (2) negligence of a fellow servant, nor (3) assumption of risk. Ky. Stats. sec. 4960, KRS 342.410; O'Brien & Co. v. Shelton's Adm'r, 246 Ky. 537, 55 S. W. (2d) 352; Mannington Fuel Co. v. Ray's Adm'r, 250 Ky.

736, 63 S. W. (2d) 933; Helton v. Gunn Coal Mining Co., 258 Ky. 168, 79 S. W. (2d) 695.

Out of the above cases, and others of like import, there have evolved these well established rules: Where the operation by a concern eligible to take advantage of the compensation law, but fails to do so it is deprived of the usual common law defenses, nevertheless it is incumbent upon the injured employee to allege and prove that the master's negligence was the proximate cause of the injury before he is entitled to take his cause to the jury. Helton case supra, and Ward v. Marshall, 293 Ky. 18, 168 S. W. (2d) 348, 349. It is likewise the rule that if the injury is caused by the contributory negligence on the part of the employee, where no negligence is shown on the part of the master, it becomes primary negligence. Negligence on the part of the master, as in this case, is measured by his duty to the servant; here by the lawful duty of appellant to afford the servant a safe place in which to perform his task. In the O'Brien case, supra [246 Ky. 537, 55 S. W. (2d) 356], we wrote:

"An employer is not required to adopt a particular method because it affords greater safety for the employee, but he is required to adopt the usual and customary method employed by ordinarily prudent men in like work under similar circumstances. Where work is extrahazardous, the employer must adopt safe methods to safeguard workmen where such methods are practicable and are customarily used by employers simularly situated."

The question in the O'Brien case, in part, is the question presented: "Did O'Brien & Co. owe decedent any duty which it violated, * * *?" We quoted the above excerpt in Christopher's Adm'r v. Blanton Stone Co., 258 Ky. 587, 80 S. W. (2d) 590, 592, preceding it with the remark: "Plaintiff contends this was work of an extrahazardous nature * * * still that does not mean [that] the stone company may not employ men to do its work. * * * [They have] the right to employ other men to do such work (drilling in limestone) and if, in doing it, a servant is injured, the liability of the master must be found not in the inherent hazards of the work, but in some negligence of the master in the way [it is] done."

The case most forcefully relied on by appellee, El-comb Coal Co. v. Coffman, 272 Ky. 93, 113 S. W. (2d) 847, appears at first glance to be applicable, but a casual reading shows that there were elements of negligence apparent and considered by the court other than the presence of the cross beam below the level of the roof of the tunnel with which the employee's head came in contact causing his injury.

Because of the divergence of facts in cases cited and others which might have been, dealing with similar questions, it would be of no benefit to refer to them or undertake to make distinctions. Each case must turn on the facts presented by the proof. The Ward-Marshall case, supra, is a fair and comprehensive statement of the applicable law, and we held there that the master may show by evidence an absence of negligence on his part, as well as evidence that the employee's negligence was the proximate cause.

The proof adduced shows that appellant was not negligent in operating its mine in the method and manner shown. The entry was constructed and maintained, and its special equipment used in a manner customarily employed in mines of similar physical character. As far as the record shows otherwise, the methods, manner of operation and use of equipment were known to deceased. It had furnished deceased with a safe place to ride at any point in the mine or entry. Deceased had been working in the mine three weeks, going in and out through the entry. In the case of Steely v. Great A. & P. Tea Co., 256 Ky. 586, 76 S. W. (2d) 900, 901, it was said, "If appellant voluntarily selected an unsafe way * * * to do his work on this occasion when there was a safe way in which to do it and his selection of the unsafe way was the proximate cause of his injury, the master was not liable."

We conclude that under all the proof the court should have sustained appellant's motion for peremptory, hence the case is reversed with directions to grant appellant a new trial, whereupon if the proof be substantially the same the court should direct a verdict for defendant. Any questions not decided are reserved.

Judgment reversed.

The whole court sitting.